# COMPOSITE EXHIBIT "A"

*21-000499470*

CHIEF FINANCIAL OFFICER
**JIMMY PATRONIS**
STATE OF FLORIDA

---

JEFFREY B. SCOTT

PLAINTIFF(S)

VS.

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO POLICY NO.
B0901LI1837279 AND RLI INSURANCE
COMPANY

DEFENDANT(S)
_____/

| | |
|---|---|
| **CASE #:** | **50-2021-CA-011571-XXXX-MB** |
| **COURT:** | **CIRCUIT COURT** |
| **COUNTY:** | **PALM BEACH** |
| **DFS-SOP #:** | **21-000499470** |

SUMMONS, COMPLAINT, STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED CASE
MANAGEMENT PLAN IN CIVIL CASES IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30,
2021(DCMS0)

# NOTICE OF SERVICE OF PROCESS

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the Chief Financial Officer of the
State of Florida. Said process was received in my office by ELECTRONIC DELIVERY on Monday,
October 18, 2021 and a copy was forwarded by ELECTRONIC DELIVERY on Friday, October 22, 2021
to the designated agent for the named entity as shown below.

           RLI INSURANCE COMPANY

           JEFFREY D. FICK

           9025 N. LINDBERGH DRIVE

           PEORIA, IL 61615

**\*Our office will only serve the initial process(Summons and Complaint) or Subpoena and is not responsible
for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court
pursuant to Florida Rules of Civil Procedure, Rule #1.080**

*Jimmy Patronis*

Jimmy Patronis
Chief Financial Officer

STEPHEN A MARINO, JR.
SHAREHOLDER
VER PLOEG & MARINO, P.A.
100 S.E. SECOND STREET
30TH FL
MIAMI, FL 33131

DR1

Case 9:21-cv-82054-KAM   Document 1-2   Entered on FLSD Docket 11/10/2021   Page 3 of 130

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2021-CA-011571-XXXX-MB

JEFFREY B. SCOTT,

     *Plaintiffs,*

v.

**SUMMONS IN A CIVIL CASE**

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO POLICY NO.
B0901LI1837279 and RLI INSURANCE
COMPANY,

     *Defendant.*

_____/

**TO:   RLI INSURANCE COMPANY**
**BY SERVICE UPON:**
**FLORIDA CHIEF FINANCIAL OFFFICER AS RA**
**200 EAST GAINES STREET**
**TALLAHASSEE, FL 32399-4201**

     YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and
serve upon:

**Stephen A. Marino, Jr., Esq., Arya Li, Esq.**
**Ver Ploeg & Marino, P.A.**
**100 S.E. Second Street, Suite 3300**
**Miami, FL 33131**
**305-577-3996; 305-577-3558** *facsimile*
**smarino@vpm-legal.com; ali@vpm-legal.com; jpacheco@vpm-legal.com**

an answer to the Complaint which is herewith served upon you, within 20 days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will
be taken against you for the relief demanded in the Complaint. You must also file your answer
with the Clerk of this Court within a reasonable period of time after service.

**JOSEPH ABRUZZO**         **Oct 18 2021**

Clerk _____       Date

By Deputy Clerk **JOSIE LUCCE**

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO.: 50-2021-CA-011571-XXXX-MB

JEFFREY B. SCOTT,

     *Plaintiffs,*

v.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. B0901LI1837279 and RLI INSURANCE COMPANY,

     *Defendant.*

_____/

## COMPLAINT

Jeffrey B. Scott sues Certain Underwriters at Lloyd's, London subscribing to Policy No. B0901LI1837279 and RLI Insurance Company, as follows:

### JURISDICTION AND VENUE

1. This breach of contract action seeks damages for Underwriters' and RLI's failure to perform their coverage obligations under the Policies they issued to Gemini Financial Holdings, LLC ("Gemini"), a property and casualty holding company that operates exclusively in the Florida insurance marketplace.

2. This Court has jurisdiction over this action because the amount in controversy is more than $30,001.00, exclusive of costs, interest, and attorney's fees.

3. Venue is proper in this county as the acts giving rise to this action occurred in Palm Beach County, Florida. The insurance policies at issue were delivered to Gemini in Palm Beach County, Florida, and the subject incidents occurred in Palm Beach County, Florida.

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

## THE PARTIES

4.      At all material times, Jeffrey B. Scott was a resident of and domiciled in Palm Beach County, Florida and is otherwise *sui juris*.

5.      Certain Underwriters at Lloyd's, London subscribing to Policy No. B0901LI1837279 is a collection of individual investors (some of whom may be domiciled and/or have their principal place of business in Florida) that participate in the business of selling insurance in Florida. Underwriters actively conducts the business of issuing insurance policies in Palm Beach County, Florida.

6.      RLI Insurance Company is an Illinois corporation with its principal place of business in Peoria, Illinois. RLI actively conducts the business of issuing insurance policies in Palm Beach County, Florida.

## GENERAL ALLEGATIONS

7.      **The Underwriters Policy:** Underwriters issued Professional Liability, Directors & Officer's Liability and Fiduciary Liability Insurance policy number B0901LI1837279 to Gemini ("Underwriters Policy").[1]

8.      The Underwriters Policy is a claims-made and reported policy that provides coverage for claims made against the directors, officers, and managers of Gemini during the Policy Period. A copy of the Underwriters Policy is attached as Exhibit A.

9.      The Underwriters Policy is comprised of two sections: (1) Professional Liability Insurance (PL); and (2) Directors and Officers Liability (D&O) and Fiduciary Liability Insurance (FL). *Id.* The PL coverage is subject to a $5,000,000 limit of liability, each Claim and in the aggregate, excess of a $250,000 retention. The D&O and FL coverage is subject to a $10,000,000

---

[1] Mr. Scott expects Underwriters and RLI to produce certified copies of their respective policies.

Page 2 of 13

limit of liability, each Claim and in the aggregate, excess of a $100,000 retention in respect of D&O Claims and a $10,000 retention in respect of FL Claims. *Id.*

10. Under the D&O section,[2] Underwriters agreed to "pay on behalf of the **Insured Persons** all **Loss** which is not indemnified by the **Insured Organization** resulting from any **Claim** first made against the **Insured Persons** and reported in writing to the Underwriters during the **Policy Period** …, if applicable, for a **Wrongful Act**." *Id.* at Private Organization Directors, Officers and Entity Liability Clause, I. Insuring Clauses.

11. The Policy defines **Loss**, in part, as money which an **Insured** is legally obligated to pay as a result of a **Claim** including, but not limited to "**Defense Costs**," which is in turn defined as "reasonable fees costs and expenses which are incurred by or on behalf of the Insureds in defending…appealing or investigating any **Claim**… including reasonable fees, costs and expenses incurred by the **Insureds** at the Underwriters request to assist the Underwriters in investigating a **Claim**." *Id.* at Private Organization Directors, Officers and Entity Liability Clause, II. Definitions.

12. A **Claim** means, in relevant part, "a written demand for monetary damages, non-monetary, or injunctive relief against any of the **Insureds**." *Id.*

13. A **Wrongful Act** means, in relevant part, "any actual or alleged breach of duty, error, misstatement, misleading statement, act or omission by any of the **Insured Persons** in their capacity as such." *Id.*

14. Pursuant to the Underwriters Policy, "Jeff Scott, President" is an **Insured Person**. *Id.*

15. The Underwriters Policy further provides that "the **Insurer** shall defend any **Claim** made against the **Insured**, if the **Insured**, notifies the **Insurer**, in writing, within 30 days of a

---

[2] Mr. Scott reserves the right to seek coverage under the PL and FL coverage sections.

1542143
S202.100

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

**Claim** made against them" and "[o]nce the **Insurer** has received written notice of **Claim** under this Policy, it shall advance,…**Defense Costs** on a current basis, but no later than sixty (60) days after the **Insurer** has received itemized bills for those **Defense Costs**. *Id.* at  Private Organization Directors, Officers and Entity Liability Clause, V. Settlement and Defense.

16.    **The RLI Policy:** RLI issued an Executive Plus Directors and Officers Liability Policy bearing policy number EPG0027008 to Gemini ("RLI Policy").  The RLI Policy is a claims-made policy that provides $10 million in coverage excess of underlying coverage provided by Underwriters. It also "drops down" in certain circumstances to provide primary coverage to an insured. A copy of the RLI Policy is attached as Exhibit B.

17.    Under the RLI Policy, RLI agreed to "pay on behalf of the **Insured Persons**, **Loss** which the **Insured Persons** are legally obligated to pay as a result of **Claims** first made during the Policy Period, or during the Discovery Period (if purchased), against the **Insured Persons** for **Wrongful Acts**; provided that if this Policy affords Excess Coverage as provided in Item 4. of the Declarations of this Policy, the Insurer shall not be liable for any **Loss** unless such **Loss** is not paid by the Underlying Insurance by reason of one or more of the following:

   a.    The insurer(s) of the **Underlying Insurance**:
   (i)    refuses to pay or indemnify the **Insured Persons** as required under the terms and conditions of the **Underlying Insurance**; or
                          *        *        *
   (iii)   rescinds or attempt to rescind the **Underlying Insurance; or**
   (iv)   fails to pay or indemnify the **Insured Persons** within sixty (60) days after a written request by or on behalf of the **Insured Persons** for such payment or indemnification;  or

   b.    according to the terms and conditions of the **Underlying Insurance**, the insurer(s) of the **Underlying Insurance** is not liable for such Loss

*Id.* at EPDO 409 (02/11), p.1.

                                                                                                          Complaint

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

18.     Under the RLI Policy, Mr. Scott qualifies as an **Insured Person**. *Id.* at EPDO 101 (02/11) p. 3.

19.     The RLI Policy defines **Claim** as a written demand for monetary or non-monetary relief against any **Insured Person**.  *Id.* at EPDO 101 (02/11) p. 2.

20.     **Loss** is defined, in relevant part, as "**monetary damages**", including but not limited to "**Defense Expenses** which the **Insured Persons** are legally obligated to pay as a result of a covered **Claim.**" *Id.* at EPDO 409 (02/11), p. 2. **Defenses Expenses** are defined as "reasonable and necessary fees and expenses (including without limitations attorneys' fees and experts' fees) incurred in the defense, investigation or appeal of a **Claim**."  *Id.* at EPDO 101 (02/11) p. 2.

21.     **Wrongful Act** "means any actual or alleged error, omission, act, misstatement, misleading statement, or breach of duty by the **Insured Persons** in their respective capacities as such…" *See Id.* at EPDO 101 (02/11) p. 4.

22.     The RLI Policy provides that the "Insurer shall advance covered **Defense Expenses** on a current basis, but no later than sixty (60) days after receipt by the Insurer of properly itemized and detailed **Defense Expense** invoices. *Id.* at MNU-EPDO-154 (01/19), p. 1.

23.     The RLI Policy also provides that the Insurer will pay to the Insured **Non-Indemnified Loss** where the Underlying Insurance fails to pay or indemnify the Insured Persons within sixty (60) days after a written request by or on behalf of the Insured Persons for such payment or indemnification. *See* RLI Policy MNU-EPDO-175 (02/19).

24.     **Non-Indemnified Loss** is defined as "Loss [i.e. monetary damages, including but not limited to **Defense Expenses**] (i) which the **Entity** is not permitted to indemnify or advance; (ii) which the **Entity** refuses to indemnify or advance, or fails to indemnify or advance within forty-five (45) days after the **Insured Person's** request for such indemnification or advancement,

or (iii) for which the **Entity** is financially unable to indemnify or advance. *See Id.* at MNU-EPDO-175 (02/19) p. 1.

25.     Insuring Clause 2 of the RLI Policy promises that "[i]n the event any **Underlying Insurance** affords broader coverage for an **Insured Person** than is afforded under this Policy, then, notwithstanding anything in this Policy to the contrary…this Policy is amended to follow and be subject to the terms and conditions of such **Underlying Insurance** only in respect of and to the extent of such broader coverage for the **Insured Persons**…If and to the extent any **Loss** is excluded under this Policy pursuant to Section 4. a. or c. but is not excluded under the **Underlying Insurance,** this Policy is amended to delete such exclusion with respect to such **Loss.**" *Id.* at EPDO 101 (02/11), p.1-2.

26.     To the extent the Underwriters Policy affords broader coverage than the RLI Policy, as set forth in Insuring Clause 2, then that Policy controls.

27.     <u>**The Underlying Claim:**</u> At all relevant times, Mr. Scott was the CEO, President, and Secretary of Gemini Financial Holding Corp. and its subsidiaries.

28.     Gemini Financial Holding Corp. ("Gemini Corp."), is a property and casualty insurance holding company that operates exclusively in the Florida insurance marketplace. Its ownership is held by Gemini Financial Holdings, LLC, the members of which were, at all relevant times, Mr. Scott and an investment fund (the "Pegasus Fund"). The Pegasus Fund is externally managed by Pegasus Capital Advisors LLC ("Pegasus"), which is a U.S.-based private equity fund advisor.

29.     <u>Pegasus' Nefarious Actions:</u> The underlying claim arises from Pegasus' nefarious actions to harvest Gemini's assets and materially divest Mr. Scott of his interests therein for its own financial gain.

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

30.     In late June 2019, Mr. Scott was informed that Pegasus had terminated most of its senior team, including its Chief Operating Officer, Chief Financial Officer, and a Pegasus Partner, all of whom served on the Gemini Board of Managers and on the Board of Directors of Gemini Corp. and its subsidiaries. It also indicated it would discontinue its efforts to raise investor capital for a new Pegasus managed fund. Instead, Pegasus wanted to focus on "harvesting value" from its remaining investments, like Gemini, to generate income.

31.     Consistent with this approach, on multiple occasions in September and October of 2019, Pegasus representatives raised the idea to Mr. Scott of withdrawing significant sums of cash from Gemini and its subsidiaries and affiliates through, for example, various distribution and payments.  Mr. Scott objected to these plans out of concern for the financial health of Gemini and its subsidiaries.

32.     Prior to June 2019, Pegasus wanted to sell Gemini and asked Mr. Scott if he wanted to buy out the Pegasus Fund's interest in Gemini.  To accommodate the requests Mr. Scott arranged to finance a buyout of the Pegasus Funds' interest in Gemini and presented the offer to Pegasus.

33.     On October 10, 2019, Mr. Scott was advised by Pegasus that the terms of his offer to finance the purchase of the Pegasus Fund's interests were substantially less than their value and "an insult."

34.     On the same date, Mr. Scott was advised by Pegasus that Gemini's longstanding regulatory counsel, Greenberg Traurig, would be replaced by another law firm.

35.     By e-mail, Pegasus requested that Mr. Scott consent to: (1) the removal of longstanding counsel, Greenberg Traurig and the appointment of new regulatory counsel; and (2) to retain Alvarez & Marsal Insurance and Risk Advisory Services, LLC as an insurance advisor.

1542143
S202.100

Complaint

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

36.     In requesting Mr. Scott's signature, Pegasus did not provide the underlying advisory agreement with Alvarez or the engagement letter with its new regulatory counsel.

37.     Once Mr. Scott obtained the advisory agreement and engagement letter, he realized that despite Pegasus' prior representations, neither Alvarez nor the new regulatory counsel would truly be representing Gemini's interests, rather than just Pegasus' interests.

38.     Mr. Scott informed Pegasus that he had concerns about consenting and requested a meeting to discuss.

39.     **The Claim:** Shortly thereafter, on October 24, 2019, in apparent retaliation for Mr. Scott's disagreement with Pegasus' efforts, Pegasus purported to terminate Mr. Scott's employment as CEO, President, and Secretary of Gemini Corp. and its subsidiaries.

40.     The Company advised that it was in the process of reviewing Mr. Scott's conduct to determine if the termination was with or without cause.

41.     Through counsel, Gemini and Pegasus (collectively referred to as the "Company") demanded that Mr. Scott "preserv[e]… data…. correspondence,… and records related to… the Company" and requested that he "confirm [his] agreement to adhere to the…demands."

42.     The letter closed with assurance that the Company was "prepared to take all necessary steps to enforce their rights and Mr. Scott's obligations."

43.     The same day, Mr. Scott was prevented from accessing the Company's offices and his company e-mail, which precluded access to the insurance policies at issue in this action.

44.     The following day, the Company wrote that it "will be seeking all appropriate action against Mr. Scott to recover for the damage he has caused and continues to cause."

45.     By letter dated November 13, 2019, the Company alleged that Mr. Scott "tortiously interfere[d] with and destabilize[d] the Company," which it claimed was a "breach of [his]

Complaint

contractual and fiduciary obligations and clear interference with the Company's contractual relationships and prospective business advantage under Delaware law…causing significant damage to the Company and its shareholders." It also claimed that Mr. Scott attempted to convince Gemini Corp. employees to quit, in violation of Sections 12(a) and 12(b) of his Employment Agreement, and that the Company "intend[ed] to pursue all available remedies, including seeking recovery of monetary damage suffered as a result of Mr. Scott's misconduct" as "Mr. Scott's misconduct caused injury and significant monetary harm to the Company that must—and will—be remedied by Mr. Scott."

46. By letter dated November 21, 2019, Mr. Scott notified the Company that he was exercising his rights to receive indemnification and advancement of expenses with respect to the demands made.

47. Mr. Scott also requested to examine and copy certain records and information as a member and manager of Gemini, pursuant to his Limited Liability Agreement and 6 Del. C. Section 18-305 for the purpose of investigating and defending against the allegations made against Mr. Scott.

48. The Company refused to provide advancement or indemnification to Mr. Scott.

49. As a result of the claims asserted against him, Mr. Scott was forced to incur attorney's fees and costs and has incurred substantial monetary and non-monetary loss.

## NOTICE TO THE INSURERS AND THEIR RESPONSES

50. **Underwriters:** Mr. Scott gave Underwriters and RLI timely notice of the Claim and requested coverage for the Loss, including but not limited to the reimbursement of legal invoices incurred in connection with Claim in the amount of $548,718.44.[3]

---

[3] This amount represents payment for defense fees and costs incurred from October 2019 through

1542143
S202.100

51.     Itemized bills for legal invoices were provided to Underwriters on January 15, 2020 and, following Underwriters' denial, the legal invoices were sent to RLI on March 26, 2020.

52.     By letter dated March 5, 2020, Underwriters denied any obligations although it determined that "Gemini does demand monetary damages, non-monetary or injunctive relief against Mr. Scott." *See* Underwriters' March 5, 2020 letter.

53.     Underwriters further reserved their right in respect of Exclusion H.2, which purports to exclude coverage based on "any personal profit or financial advantage gained by any of the 'Insured Persons' to which they were not legally entitled."

54.     Exclusion H.2 only applies "if a final, non-appealable adjudication in the underlying proceeding or action…establishes the gaining of such profit, or advantage" and the exclusion "shall not apply to "Defense Costs" incurred up until such determination is made"

55.     **RLI:** RLI determined that the November 13th letter constitutes a Claim under the RLI Policy, but RLI has failed to pay for Defense Expenses and/or Non-Indemnified Losses incurred.

56.     RLI maintained that Defense Expenses as defined in the RLI policy do not include legal fees and investigation costs incurred prior to their receipt of notice of a claim or fees, costs, or expenses incurred in connection with any offensive action against Gemini.

57.     The RLI Policy, however, is amended and subject to the Underlying (*i.e.*, Underwriters') Policy's broader coverage, including its definition of Defense Costs.

58.     Additionally, the RLI Policy provides that the Insurer will pay to the Insured Non-Indemnified Loss where the Underlying Insurance fails to pay or indemnify the Insured Persons

---

January 2020. Mr. Scott has since incurred additional defense fees and costs.

1542143
S202.100

Complaint

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

within sixty (60) days after a written request by or on behalf of the Insured Persons for such payment or indemnification.

59.     RLI acknowledges the existence of a valid Claim against Mr. Scott and that Mr. Scott incurred legal and investigatory expenses constituting Defense Costs pursuant to the terms of the Underlying Policy.

60.     RLI further acknowledges that Mr. Scott requested indemnification from both the Company and the Underlying Insurers and neither indemnified Mr. Scott for such Defense Costs.

61.     Mr. Scott engaged the undersigned counsel to represent his interests in this action, and agreed to pay a reasonable fee for services rendered.

62.     All conditions precedent to bringing this action have been performed, waived, or have otherwise occurred.

## COUNT I: BREACH OF CONTRACT – UNDERWRITERS

63.     Plaintiff re-alleges the allegations contained in paragraphs 1 through 62.

64.     At all times material to this action, Mr. Scott was insured under the Underwriters Policy, which is an enforceable contract under the laws of the State of Florida and was in effect at the time of the Loss.

65.     All conditions precedent for coverage under the Underwriters Policy have been satisfied.

66.     The Underwriters Policy obligated Underwriters to perform certain duties, including the duty to timely pay Loss which is defined to include Defense Costs, such as the reasonable fees costs and expenses incurred in defending or investigating any Claim.

67.     Underwriters failed to perform its duties under the Underwriters Policy, and thus breached the contract, by those acts and omissions alleged above, including without limitation its

1542143
S202.100

Complaint

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

failure to fully and fairly investigate the claims made against Mr. Scott and their refusal to make any payment of Mr. Scott's defense costs. No exclusions or other limitations apply.

68.     As a direct, foreseeable, and proximate result of Underwriters' breach of its obligations under the Underwriters Policy, Mr. Scott has suffered and continues to suffer damages.

**WHEREFORE**, Jeffrey B. Scott demands judgment against Certain Underwriters at Lloyd's, London subscribing to Policy No. B0901LI1837279 for the full amount of the covered Loss, which includes the loss of his interests in the Company, pre- and post-judgment interest, attorney's fees pursuant to Fla. Stat. § 626.9373, and any further relief this Court deems equitable, just, and proper.

## COUNT II: BREACH OF CONTRACT – RLI

69.     Plaintiffs re-allege the allegations contained in paragraphs 1 through 62.

70.     At all times material to this action, Mr. Scott was insured under the RLI Policy, which is an enforceable contract under the laws of the State of Florida and was in effect at the time of the Loss.

71.     All conditions precedent for coverage under the RLI Policy have been satisfied.

72.     The RLI Policy obligated RLI to perform certain duties, including the duty to fairly and fully investigate the claim and to timely pay Loss, which is defined to include Defense Expenses, such as the reasonable fees costs and expenses incurred in defending or investigating any Claim and Non-Indemnified Loss.

73.     To the extent the Underwriters Policy affords broader coverage than is afforded under the RLI Policy, the RLI Policy is amended to follow and be subject to the terms and conditions of the Underwriters Policy.

1542143
S202.100

Complaint

*Scott v. Certain Underwriters at Lloyd's, London, et al.*

74.     RLI failed to perform its duties under the RLI Policy, and thus breached the contract, by those acts and omissions alleged above, including without limitation its refusal to make any payment, much less full and timely payment of Mr. Scott's defense expenses and or his Non-Indemnified losses.

75.     No exclusions or other limitations apply.

76.     As a direct, foreseeable, and proximate result of RLI's breach of its obligations under the RLI Policy, Mr. Scott has suffered and continues to suffer damages.

**WHEREFORE**, Jeffrey B. Scott demands judgment against RLI Insurance Company for damages for the full amount of the covered Loss, which includes legal fees and costs incurred, Non-Indemnified Loss, the loss of his interests in the Company, pre- and post-judgment interest, attorney's fees pursuant to Fla. Stat. § 627.428/626.9373, and any further relief this Court deems equitable, just, and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff, Jeffrey B. Scott, hereby requests trial by jury of all issues so triable.

Dated: October 13, 2021.

Respectfully Submitted,

VER PLOEG & MARINO, P.A.
100 S.E. Second Street, Suite 3300
Miami, FL 33131
305-577-3996
305-577-3558 *facsimile*

/s/ Stephen A. Marino, Jr.
**Stephen A. Marino, Jr.**
Florida Bar No. 79170
smarino@vpm-legal.com
jpacheco@vpm-legal.com
**Arya Attari Li**
Florida Bar No. 58847
ali@vpm-legal.com

Page 13 of 13

**EXHIBIT A**



**JLT SPECIALTY**
Limited

| Policy No<br>B0901LI1837279 | | | | **901**<br><br>**JLT** | |
|---|---|---|---|---|---|
| **Market<br>Reform<br>Contract** | R/I | | BKR | LISTS | |
| | YES | NO | | YES | NO |
| | | | | | |
| | DATE | | DATE | DATE | |
| | | | | | |

| Insured |
|---|
| Gemini Financial Holdings, LLC. |

| Period |
|---|
| 25ᵗʰ December 2018 to 25ᵗʰ December 2019 |

Period

25th December 2018 to 25th December 2019

Risk

Primary Insurance Company Professional Liability, Director's & Officer's Liability and Fiduciary Liability Insurance.

For LLOYD's use

For IUA use

For LIRMA use

JLTL Auth:   a4t



6 9 4 4 7 9 0 1 0 0 4



| | |
|---|---|
| B0901LI1837279 | **901**<br>**JLT** |

Page 1 of 11

## RISK DETAILS

**Unique Market Reference:** B0901LI1837279

**Type:** Primary Insurance Company Professional Liability, Director's & Officer's Liability and Fiduciary Liability Insurance.

**Insured:** Gemini Financial Holdings, LLC.

**Principal Address:** 4200 Northcorp Parkway
Suite 400
Palm Beach Gardens
FL 33410
United States of America

**Period:** From: 25th December 2018
To: 25th December 2019

both days at 12.01 am Local Standard Time at the address of the Insured.

**Interest:** **Section One:** Primary Insurance Company Professional Liability Insurance.

**Section Two:** Primary Director's & Officer's Liability and Fiduciary Liability Insurance.

**Limit(s) of Liability:** **Section One**
USD 5,000,000 each Claim and in the aggregate.

*and separately;*

**Section Two**
USD 10,000,000 each Claim and in the aggregate.

**Overall Aggregate Limit(s) of Liability:** USD 15,000,000 in the aggregate.

**Retention:** **Section One**
USD 250,000 each and every Claim.

**Section Two**
USD 100,000 each and every Claim in respect of Director's & Officers Liability but USD 10,000 in respect of Fiduciary Liability.

**Territorial Limits:** Worldwide

**Jurisdictional Limits:** Worldwide



| | |
|---|---|
| B0901LI1837279 | **901**<br>**JLT** |

**Conditions:**  Insurance Company Professional Liability, Director's & Officer's Liability and Fiduciary Liability Policy Wordings, as attached.

Tie-in of Limits Endorsement, as attached.

No Liability Endorsement (Lloyd's Syndicate TAL 1183), as attached.

Service of Suit Clause, as attached.

<u>Pending or Prior Litigation/Continuity Dates:</u>

Insurance Company Professional Liability:
25th October 2009 in respect of USD 2,000,000 each Claim and in the aggregate Limit of Liability but 14th September 2015 in respect of USD 3,000,000 in the aggregate in excess of USD 2,000,000 in the aggregate Limit of Liability.

*Directors & Officers Liability*:
25th October 2009 in respect of USD 1,000,000 each Claim and in the aggregate Limit of Liability but 14th September 2015 in respect of USD 4,000,000 in the aggregate in excess of USD 1,000,000 in the aggregate Limit of Liability.

25th December 2018 in respect of USD 5,000,000 each Claim in the aggregate Limit of Liability in excess of USD 5,000,000 in the aggregate Limit of Liability.

*Fiduciary Liability:*
*25th October 2009*

**Notification of Claims to:**
Insurer(s) via:
JLT Specialty Limited
The St Botolph Building
138 Houndsditch
London EC3A 7AW
United Kingdom

**Choice of Law and Jurisdiction:**  **Law**:    This Policy shall be subject to the Laws of Florida.

**Jurisdiction**:  United States of America

**Premium:**  USD 140,000

**Premium Payment Terms:** LSW 3001 - 60 days.





## PREMIUM PAYMENT CLAUSE

Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 60 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 60th day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing.  In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 30 days prior notice of cancellation to the (Re)Insured via the broker.  If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked.  If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

| | |
|---|---|
| **Taxes Payable by Insured and administered by Insurers:** | None |
| **Recording, Transmitting & Storing Information:** | Where JLT Specialty Limited maintains risk and claim data / information / documents JLT Specialty Limited may hold data / information / documents electronically. |
| **Insurer Contract Documentation:** | This document details the contract terms entered into by the insurer(s) and constitutes the contract document. |

AUL
1274



B0901LI1837279

**901
JLT**

This contract is subject to US state surplus lines requirements.  It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the insured.  In the event that the surplus lines notice is not affixed to the contract document the insured should contact the surplus lines broker.

**Contract Change Documentation:**

The Contract change document(s) signed by the insurers shall form the evidence of the changes agreed.





| B0901LI1837279 |
|---|

**901
JLT**

Page 5 of 11

## **INFORMATION**

Information made available to and seen by all subscribing Insurers hereon includes the following:

1. Olympus Insurance Company – SNL Corporate Profile Report
2. Gemini Financial Holdings – 2017 Consolidated Financial Statements
3. Olympus Insurance Company – 2017 Consolidated Financial Statements
4. Organisational Chart
5. Company Overview Document
6. ICPL Application
7. Radiant Insurance Agency E&O Application
8. Subsidiary Schedule
9. Outside Service Provider Document
10. Investment advisory agreement
11. Subjectivity information as contained within an email from Natasha Kiemnec (JLT Specialty USA) on Monday 17th December 2018 at 18.42 EST.





B0901LI1837279

**901**
**JLT**

Page 6 of 11

## SECURITY DEFAULT CANCELLATION CLAUSE

Notwithstanding anything contained in this Policy to the contrary, in the event of a 'Default Event' occurring (as hereinafter described) in relation to any Insurer (as defined below), the Insured shall have the right to give notice of cancellation to such Insurer in respect of their participation in this Policy. Such cancellation shall be effective as at the date of the Default Event, without prejudice to any accrued rights of the Insured in relation to claims in relation to the period prior to the occurrence of the Default Event, or, at the sole discretion of the Insured (and always subject to any other cancellation date imposed by any relevant law or statute governing insolvency and liquidation generally in the country in which the Insurer has its place of incorporation or domicile), such date thereafter during the period of this Policy as the Insured may stipulate in its notice of cancellation. To be effective, any notice of cancellation by the Insured under this Clause must be delivered in writing to the Insurer whose participation is being cancelled.

A "Default Event" shall be deemed to have occurred if either an Insurer:

(a)   is placed into voluntary or involuntary liquidation, rehabilitation, bankruptcy, receivership, chapter 11, administration or is dissolved or is the subject of any similar relief or state of affairs for the protection of some or all of the creditors of the Insurer or is the subject of any application, resolution or petition for or with a view to effecting any of the foregoing, or proposes a scheme of arrangement; or

(b)   has its Financial Strength Rating or its Financial Performance rating, as published by Standard & Poor's or A M Best, downgraded below A- or A minus respectively; or

(c)   ceases underwriting or formally announces its intention to do so; or

(d)   has its regulatory authority to carry on insurance business withdrawn or modified.

In relation to a Lloyd's Syndicate, the published rating, as referenced in sub-paragraph (b) above, shall be that which applies to Lloyd's as a whole, provided Lloyd's continues to be rated as a single entity by Standard & Poor's or A M Best.

Any Insurer whose participation in this Policy is cancelled by the Insured in accordance with this Clause shall return to the Insured its share of unearned premium, which shall be calculated on a pro-rata daily basis. If the premium for this Policy is adjustable it is agreed such adjustment will take place in accordance with the original terms of this Policy and, if applicable, the resultant additional or return premiums shall be applied pro-rata to the time such Insurer participated in this Policy.

In the event that

(i)    such Insurer has made any payment arising out of a claim or loss under this policy; or

(ii)   the lead insurer of this policy had raised a reserve in excess of 75% of the applicable self-insured retention or deductible, or if an excess policy, the lead insurer has raised a reserve in excess of an underlying policy limit,  in connection with a potential claim or loss under this policy,





B0901LI1837279

**901
JLT**

Page 7 of 11

prior to the occurrence of a Default Event, then any refund of premium shall be an amount which is determined to be reasonable in view of the amount of any payment referred to in (i) above and/or the amount of any reserve referred to in (ii) above.

It is further agreed that either party shall be entitled to off-set any monies which are owed by the other party as at the date of cancellation under this Policy.

In the event that any insurer's participation hereon is cancelled as a result of a Default Event the remaining insurers hereon agree, if required, to sign up to original written lines.

For the avoidance of doubt the reference to "this Policy" in this clause does not include any followed or underlying policy covering the same subject matter and risk.

As used in this Clause, "Insurer" means each insurance company, reinsurance company, Lloyd's Syndicate or other risk bearing entity subscribing to this contract.  "Insured" may mean Insured under a contract of direct insurance or Reinsured under a contract of reinsurance, as the case may be.





### SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

**Kaufman, Dolowich & Voluck LLP
135 S LaSalle St
Suite 2100
Chicago
IL 60603
United States of America**

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.
The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

24/4/86
NMA1998





B0901LI1837279

## SECURITY DETAILS

**(Re)insurer's Liability:**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333
21 June 2007





| | B0901LI1837279 | **901**<br>**JLT** |
|---|---|---|

**Order Hereon:**  100% of 100%

**Basis of Written Lines:**  Percentage of Whole

**Signing Provisions:**  In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the Insurers.

However:

a)  in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b)  the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the Insured and all Insurers whose lines are to be varied. The variation to the contracts will take effect only when all such Insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

Notwithstanding the foregoing, in the event of late placement and where there is no specific instruction from the Insured to sign lines disproportionately, the Insured and all Insurers whose lines are not written "To Stand" agree to sign proportionately irrespective of the date on which their line was committed. Signing bureaux are authorised to accept signed lines calculated by JLT Specialty Limited without further agreement or endorsement.





| | B0901LI1837279 | 901 JLT |

**Written Lines:**

In a co-insurance placement the following (re)insurers may, but are not obliged to, follow the premium charged by the Slip Leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

### WRITTEN LINES (attaching to line slip reference B0901LI1831342)

antares ⚓ AUL 1274     27/12/18.

50/o.   | 3 | 0 | 4 | 2 | 9 | 3 | 6 | 0 | 0 | 0 | 1 | 8 |   Section 1   BPC

33.34   | 3 | 0 | 4 | 2 | 9 | 3 | 6 | 0 | 0 | 1 | 1 | 8 |   Section 2   D#0.





| B0901LI1728274000 | **901**<br>**JLT**<br>Page 1 of 8 |

---

**Written Lines:**   In a co-insurance placement the following (re)insurers may, but are not obliged to, follow the premium charged by the Slip Leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

### WRITTEN LINES (open market)

33.33%  TALBOT  27/12/18  TAL 1183
An AIG company

C F L 2 6 5 2 4 1 A 1 8   D4, Section 2 only.

A A A N N N N N N A N N
FI@talbotuw.com S: 100%



V E R T E X

Vertex Underwriting Management Limited

50%.
33.33%.   1 8 C

SECTION 1 (F2)
SECTION 2 (D4)

UMR: B0146ERINT   1800462
AML 2001 - 50%
MRS 457 - 50%

All premium payments to be made to: Bluefriars Brokers Ltd
All notifications of claims and circumstances to: AML 2001

27
1/2
18





| B0901LI1728274000 |
|---|

**Written Lines:**

In a co-insurance placement the following (re)insurers may, but are not obliged to, follow the premium charged by the Slip Leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

**WRITTEN LINES (open market)**





B0901LI1728274000

## SUBSCRIPTION AGREEMENT
### (not to appear in contract)

**Slip Leader:** Lloyd's Syndicate AUL 1274

**Basis of Agreement to Contract Changes:**

Subject to the GUA (October 2001) incorporating Non-Marine Schedule (October 2001). Wording to be agreed by Slip Leader only binding all other Insurers.

Notwithstanding the above referenced GUA and Schedule:

1. Any alteration, amendment or addition to this (re)insurance that is not outside the terms catered for within this slip or the policy wording, or that is not deemed material by the Slip Leader, to be agreed Slip Leader only on behalf of all subscribing Insurers.

2. Extensions in period by up to 31 days to be agreed Slip Leader only on behalf of all subscribing Insurers.

3. Notification of contract changes to all subscribing Insurers to be at discretion of Slip Leader only.

**Other Agreement Parties for contract changes, for Part 2 GUA changes only:**

Where no other agreement parties for contract changes are so identified hereunder, Slip Leader alone is authorised to agree Alterations set out in Part 2 of the GUA schedules on behalf of Other Insurers.

**Agreement parties for contract changes, for their participation only:**

+ VERTEX UNDERWRITING MANAGEMENT LIMITED

None unless specified herein

**Basis of Claims Agreement:**

Claims to be managed in accordance with:

(i) The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto.

(ii) IUA claims agreement practices.

(iii) The practices of any company(ies) electing to agree claims in respect of their own participation.

**Claims Agreement**

VERTEX UNDERWRITING MANAGEMENT LIMITED
(VIA MS AMLIN)

AUL
1274



| B0901LI1728274000 |
|---|

**901**
**JLT**
Page 4 of 8

**Parties:**

(i)    For Lloyd's syndicates

The leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate and/or the Scheme Service Provider.

The second Lloyd's Syndicate is: TAL 1183

(ii)    Those companies acting in accordance with the IUA claims agreement practices, excepting those that may have opted out via iii below.

(iii)    Those companies that have specifically elected to agree claims in respect of their own participation.

(iv)    All other subscribing insurers that are not party to the Lloyd's/IUA claims agreement practices, each in respect of their own participation.

(v).    Slip Leader solely to appoint necessary experts relevant to claims investigation

**Claims Administration:**

JLT Specialty Limited and Insurers agree that any claims hereunder (including any claims related costs / fees):

Will be notified and administered via ECF (provided claim is "in scope") with any payment(s) processed via CLASS, (unless both parties agree otherwise).

and/or

Broker to enter claim advices into CLASS. All company market bureau insurer(s) to use CLASS for claims agreement.

and/or

Will be notified to all company market non-bureau insurer(s) and/or overseas company insurer(s) as applicable by JLT Specialty Limited.

**Rules and Extent of**
**Any other Delegated**
**Authority:**    None





B0901LI1728274000

901
JLT
Page 5 of 8

**Expert Fees:** JLT Specialty Limited to collect fees applicable to Lloyd's, IUA and LIRMA markets, unless agreed to be collected via a Market Expert Fees Scheme. Non bureau insurers will be presented with expert fee invoice by JLT Specialty Limited, but will settle directly with expert.

**Settlement Due Date:** 24th February 2019.

**Bureaux Arrangements:** JLT Specialty Limited to present de-linked signings to Xchanging Ins-Sure Services Ltd where possible.

Insurers authorise Xchanging In-Sure Services Ltd. and/or Xchanging Claims Services (XCS) Limited to take down additional premiums, return premiums, non-premium endorsements and claims on photocopies of this contract (or Full Policy if applicable)

Signing Slips and signing slip endorsements to be agreed Slip Leader only.

### PREMIUM PROCESSING CLAUSE

Where the premium is to be paid through Xchanging *Ins-sure Services (XIS)*, payment to Insurers will be deemed to occur on the day that a delinked premium is released for settlement by the Appointed Broker or in the case of non-delinked premiums, on the day that the error-free Premium Advice Note (PAN) is submitted to XIS.

Where premiums are to be paid by instalments under the Deferred Account Scheme, and the Appointed Broker does not receive the premium in time to comply with the agreed settlement date for the second or subsequent instalment, the Appointed Broker, if electing to suspend the automatic debiting of the relevant deferred instalment, shall advise the Slip Leader in writing and instruct XIS accordingly. XIS shall then notify Insurers. Payment to any entity within the same group of companies as the Appointed Broker will be deemed to be payment to the Appointed Broker.

Nothing in this clause shall be construed to override the terms of any Premium Payment Warranty or Clause or any Termination or Cancellation provision contained in this contract. Furthermore, any amendment to the Settlement Due Date of a premium instalment as a result of the operation of this Premium Processing Clause shall not amend the date that such instalment is deemed to be due for the purposes of such Premium Payment Warranty or Clause or Termination or Cancellation provision unless (Re)Insurers expressly agree otherwise.

Appointed Broker: JLT Specialty Limited

14/12/09
LSW3003





| B0901LI1728274000 | **901**<br>**JLT**<br>Page 6 of 8 |
|---|---|

**Bureaux & Non Bureaux Arrangements:**

1.  Insurers agree to sign policies in advance of premium payment (FDO Policy) at discretion of JLT Specialty Limited.

2.  Insurers agree to process cash or de-linked signings notwithstanding any outstanding subjectivity(ies).

3.  Insurers agree that second and subsequent instalments of premium are to be taken down as additional premiums.

4.  Where any settlement due date (SDD), premium payment warranty (PPW) or condition (PPC) due date falls on a weekend or public holiday, payment to Insurers hereon on the next working day will be deemed to be in compliance with such SDD, PPW or PPC.

5.  Where a PPW or PPC requires payment by a date which is later than the SDD, the SDD is deemed to have been amended and shall be the same as the PPW or PPC due date.

6.  Insurers agree that JLT Specialty Limited may settle premiums for this contract at different times and that de-linked premiums may be released into settlement at different times.





| B0901LI1728274000 |
|---|

## FISCAL & REGULATORY
### (not to appear in contract)

**Taxes Payable by Insurers(s):** None

**Country of Origin:** United States of America

**Overseas Broker:** JLT Specialty Insurance Services Inc
1520 Market Street, Suite 300
Denver,
Colorado,80202
United States of America

**Surplus Lines Broker:** JLT Specialty Insurance Services Inc
1520 Market Street, Suite 300
Denver,
Colorado,80202
United States of America

Surplus Lines License No: 1959517

**State of Filing:** Florida

**US Classification:**
(For Lloyd's Use Only) US Surplus Lines

**Allocation of Premium to Coding:**
D4: 40 %
F2: 60 %

**Regulatory Client Classification:** Large Risk





| | B0901LI1728274000 | **901**<br>**JLT**<br>Page 8 of 8 |
|---|---|---|

## BROKER REMUNERATION
### (not to appear in contract)

**Fee Payable by Client:**     No

**Total Brokerage:**     23.75%     25% in respect of Talbot 1183 *tal* 27/12/18

22-5% IN RESPECT OF VERTEX UNDERWRITING MANAGEMENTS

**Other Deductions from Premium:**     7.5%     nil in respect of Talbot 1183 *tal* 27/12/18

NIL IN RESPECT OF VERTEX UNDERWRITING LTD

# Section One: Insurance Company Professional Liability for Financial Institutions

**POLICY NUMBER:**    B0901LI1837279

---

### NOTICES

COVERAGE WITHIN THIS POLICY IS GENERALLY LIMITED TO LOSS FROM CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD AND REPORTED TO THE INSURER AS THE POLICY REQUIRES.   DEFENSE COSTS REDUCE THE LIMITS OF LIABILITY (AND, THEREFORE, AMOUNTS AVAILABLE TO RESPOND TO SETTLEMENTS AND JUDGMENTS) AND ARE APPLIED AGAINST APPLICABLE RETENTIONS.

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND UNLESS SUCH COVERAGE IS EXPRESSLY PROVIDED WITHIN A COVERAGE SECTION.   WHERE THE INSURER HAS NO DUTY TO DEFEND, IT WILL ADVANCE DEFENSE COSTS, EXCESS OF THE APPLICABLE RETENTION, PURSUANT TO THE TERMS OF THIS POLICY PRIOR TO THE FINAL DISPOSITION OF A CLAIM.   PLEASE REFER TO THE COVERAGE SECTIONS PURCHASED FOR DEFENSE RELATED DETAILS.

PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER TO DETERMINE WHAT IS AND WHAT IS NOT COVERED.

---

# DECLARATIONS

| ITEMS | | | |
|---|---|---|---|
| 1 | **NAMED ENTITY**: | (the "Named Entity") MAILING ADDRESS: | Gemini Financial Holdings, LLC. 4200 Northcorp Parkway Suite 400 Palm Beach Gardens FL 33410 United States of America |

| 2 | **POLICY PERIOD**: | From: | 25th December 2018 | To: | 25th December 2019 |
|---|---|---|---|---|---|
| | | Both days inclusive at the mailing address stated in Item 1 above | | | |

**3**

## COVERAGE SUMMARY

| | Liability Coverage Section | Limit of Liability | Retention | Dates | Premium |
|---|---|---|---|---|---|
| **E&O** | Insurance Company Professional Liability | USD 5,000,000 | USD 250,000 | Continuity: 25th October 2009 in respect of USD 2,000,000 aggregate limit; 14th September 2015 in respect of USD 3,000,000 in the aggregate limit in excess of USD 2,000,000 in the aggregate limit; | USD 75,000 |

**4** | TOTAL PREMIUM: USD 75,000

**5**

OTHER LIMITS OF LIABILITY

| (a) POLICY AGGREGATE LIMIT OF LIABILITY: | USD 5,000,000 |
|---|---|

**6** NAME OF INSURERS

Lloyd's Syndicates Antares AUL 1274, Talbot TAL 1183 and Vertex.

PRODUCER: JLT Specialty USA
PRODUCER LICENSE NO.: OJ02952
ADDRESS: 1520 Market Street, Suite 300, Denver, CO 80202

THIS IS A "CLAIMS MADE AND REPORTED" POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER IN WRITING, **AS REQUIRED BY THIS POLICY,** DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE. IN ADDITION, DEFENSE COSTS ARE INCLUDED IN AND WILL REDUCE THE LIMITS OF LIABILITY.

PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT YOUR BROKER OR OTHER

REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.

## INSURANCE COMPANY PROFESSIONAL LIABILITY
### ("ICPL Policy")

In consideration of the payment of the premium, and each of their respective rights and obligations in this policy, the **Insureds** and the **Insurer** agree as follows:

## 1. INSURING AGREEMENT

This policy shall pay the **Loss** of any **Insured** that arises from any **Claim** first made against such **Insured** during the **Policy Period** or any applicable **Discovery Period**, and reported to the **Insurer** as required by this **Policy**, for any **Wrongful Act** of the **Insured** in the rendering of or failure to render **Professional Services**.

## 2. DEFINITIONS

**Application**  means:

(1) any written statements and representations made by an **Insured** and provided to the **Insurer** during the negotiation of this **Policy**, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this **Policy**; and

(2) each and every public filing by or on behalf of the **Organization**, including any filings with the U.S. Securities and Exchange Commission or any similar federal, state, local, or foreign regulatory agency, provided that such public filing was filed during the 12 month period immediately preceding the inception of the **Policy Period**.

**Claim**  means:

(1) a written demand for monetary compensation or other relief (including but not limited to non-pecuniary relief or restitution of a compensatory nature), a request to toll or waive the statute of limitations; or

(2) notice of any suit; or

(3) investigation inquiry costs; or

(3) a civil, criminal, regulatory, administrative or arbitration proceeding which is commenced by:

(i) service of a complaint or similar pleading; or

(ii) receipt or filing of a notice of charges.

**Client**  means a person or entity for whom or for which the **Insured** provides **Professional Services**

**Defense Costs**  means reasonable fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond)  resulting from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**. **Defense Costs** shall not include the compensation of any **Insured Person**.

**Information Holder** means the **Named Entity's** Chief Executive Officer, Chief Financial Officer and Chief Actuary.

**Insurance Agent** means the following activities undertaken pursuant to a valid license in both the state where an **Insured** is located and the state where a **Client** is located or transaction is undertaken:

(1) the soliciting, placing, selling or servicing of property and casualty insurance, life insurance, accident and health insurance, long-term care insurance, disability income insurance or fixed annuities;

(2) insurance consulting and expert witness services for a **Client** in connection with insurance related matters;

(3) appraising real or personal property for a **Client** in connection with the products set forth above;

(4) arrangement of premium financing for a **Client** in connection with the placement of insurance coverage;

(5) safety consulting, loss control services and risk management services for a **Client** in connection with the products set forth above;

(6) services as a notary public in connection with the products set forth in this definition; and

(7) reinsurance intermediary activities.

**Continuity Date** means the date set forth in Item 3 of the Declarations.

**Enforcement Body** means: (1) any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general), or (2) the enforcement unit of any securities or commodities exchange or other self-regulatory organization

**Insured** means:

(1) any **Insured Person**; including the following individuals:

Jeff Scott, President
Dutta Subhashish, President Gemini Re
Peter Forester Chief Actuary
Lyle Freedman, Chief Technology Officer
Jennifer Gravelle, Chief Financial Officer
Lora Leverage, Vice President Claims
Colleen Marchesani, Director of Human Resources
Scott Campbell, Director of Property Claims Operations
Douglas Collins, Controller Financial Reporting
Michelle Dempsey, AVP Operational Process Management
Thomas Green, Project Manager

Laura Johnson, AVP of Underwriting and Product Development
Crystal McInnis, AVP Sales & marketing
Courtney Siders, Senior Counsel and Manager
Matt Haynes, Treaties and Finance
Travis Rosencrans, Portfolio Manager
Mike Taylor, Managing Director and Head of Fundraising and Investor Relations

or

(2) an **Organization**.

**Insured Person**   means:

(i) any past, present or future director, officer or employee (including for the avoidance of doubt employed lawyers) of an **Organization**, solely while acting in his or her capacity as such;

(ii) the spouse or domestic partner of an **Insured Person** for **Loss** arising from a **Claim** for a **Wrongful Act** of such **Insured Person;**

(iii) the administrator, heirs, legal representatives or executor of a deceased, incompetent, insolvent or bankrupt **Insured Person's** estate for **Loss** arising from a claim for a **Wrongful Act** of such **Insured Person;**

(vi) a natural person engaged by an **Organization** under a contract of service; and

(vii)   an intern or trainee who is working with an insured company as a student, or on secondment or work experience.

But only (save for (ii) or (iii) above) when such persons are performing **Professional Services.**

**Loss**   means damages, settlements, judgments (including pre/post-judgment interest on a covered judgment) and **Defense Costs**.

"**Loss**" shall also include the following items where insurable by law: (1) fines or penalties; (2) punitive or exemplary damages; and (3) the multiplied portion of multiplied damages.

"**Loss**" shall not include (1) taxes (save where such liability for taxes arises from a **Wrongful Act**); (2) any liability of cost incurred by any **Insured** in complying with any judgment, award or settlement for non-monetary relief; (3) any amounts for which the **Insured** is liable under any insurance or reinsurance policy, contract, treaty, binder, slip, certificate, cover note, agreement, suretyship, endorsement, endowment or annuity; (4) any amounts for which the **Insured** is entitled to indemnity and/or payment under any other insurance or reinsurance contract; (5) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; and (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such punitive, exemplary and multiplied damages.

**Management Control**   means:

(1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or

(2) having the right, pursuant to written contract or the by-laws, charter,

operating agreement or similar documents of an **Organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

**Managing General Agent**  means one who acts as an agent of an insurer and whose authority goes beyond those of an ordinary insurance agent to include authority to manage all or part of the insurance business of such insurer. Such authority may include, but is not limited to, the management of a separate division, department or underwriting office, or line, sub-line or class of business, whether or not limit geographically, whether or not having authority to appoint sub-agents or accept sub-produced business, and whether or not having authority to cede or assume reinsurance on behalf of such insurer.

**Pollutants**  means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. "**Waste**" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

**Organization**  means:

(1) the **Named Entity**;

(2) each **Subsidiary**; and

(3) in the event a bankruptcy proceeding shall be instituted by or against any of the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States of America), if any.

**Professional Services**  means any advice or services or duties actually, or required to be, provided, undertaken, given or rendered by or on behalf of the **Insured** for or on behalf of a policyholder or a customer or client of an **Organization** in the ordinary course of its business.

**Related Claim**  means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were alleged in another **Claim** made against an **Insured**.

**Securities Broker-Dealer**  means a person or entity acting as a "broker" or "dealer" in securities, as such terms are defined in Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, as amended.

**Security**  means hardware, software or firmware whose function or purpose is to mitigate loss from or prevent a computer attack.  **Security** includes, without limitation, firewalls, filters, DMZ's, computer virus protection software, intrusion detection, the electronic use of passwords or similar identification of authorized users. **Security** also includes the **Insured's** specific written policies or procedures intended to directly prevent the theft of a password or access code by non-electronic means.

**Subsidiary**  means any entity of which the **Named Entity** has or had **Management Control** on or before the **Inception Date** of this policy either directly or indirectly through one or more of its other **Subsidiaries**.  An entity ceases to be a **Subsidiary** when

|  | the **Named Entity** no longer maintains **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**. |
| **Third Party Administrator** | means an entity that provides insurance services to a policyholder, customer or client in its capacity as a manager, administrator, consultant, agent or claims administrator. |
| **Transaction** | means: |

(1) the **Named Entity** consolidating with or merging into another entity such that the **Named Entity** is not the surviving entity, or selling all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2) any person or entity or group of persons or entities acting in concert acquiring **Management Control** of the **Named Entity**;

|  |  |
| **Wrongful Act** | means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by an **Insured** or any person for whom an **Insured** is legally liable. |

## 3. EXCLUSIONS

The **Insurer** shall not be liable to make payment for **Loss** in connection with that portion of any **Claim** made against an **Insured**:

(a) for:

   (1) the commission of any deliberately fraudulent act by the **Insured**; or

   (2) any profit or other financial advantage to which the **Insured** was not legally entitled

   if established by any final, non-appealable adjudication in the underlying proceeding; provided, however, that the exclusion in subparagraph (1) above shall not apply to the extent that such **Claim** alleges bad faith in the rendering of or failure to render **Professional Services**.

   The exclusion in subparagraph (1) and (2) shall not apply to **Defense Costs**.

   The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured Person** for the purpose of determining the applicability of the foregoing exclusions (a)(1) and (a)(2);

(b) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Acts** alleged or contained, in any **Claim** which has been reported and accepted, or in any circumstances of which notice has been given and accepted, under any policy of which this is a direct renewal or replacement.;

(c) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which any **Insured** had notice; or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(d) for bodily injury, sickness, emotional or mental distress, disease or death of any person;

provided, however, this exclusion shall not apply to **Loss** arising from a **Claim** alleging a **Wrongful Act** of the **Insured** in the rendering or failure to render **Professional Services;**

(e)    for loss or damage to or destruction of any property from any cause, including the loss of use thereof;

provided, however, this exclusion shall not apply to **Loss** arising from a **Claim** alleging a **Wrongful Act** of the **Insured** in the rendering or failure to render **Professional Services;**

(f)    for libel, slander or for injury from other defamatory or disparaging material; false arrest, detention, imprisonment or violation of the right to privacy; wrongful entry or eviction; or discrimination on any basis provided, however, that this exclusion shall not apply to **Loss** arising from a **Claim** alleging a **Wrongful Act** of the **Insured** in the rendering or failure to render **Professional Services.**

(g)    alleging, arising out of, based upon or attributable to, directly or indirectly, infringement or violation of copyright, patent, trademark, service-mark, trade secret or any other intellectual property rights;

(h)    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly

    (1)   the actual, alleged, threatened or potential discharge, dispersal, release or escape of **Pollutants;**

    (2)   any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants;** or

    (3)   the actual, alleged, threatened or potential nuclear reaction, radiation or radioactive contamination;

provided, however, the exclusions in subparagraphs (1) and (2) above shall not apply to:

    (i)  the **Insured's** evaluating the scope of coverage, making payments or communicating the same with respect to an underlying pollution claim of a customer or client within the normal course of the **Insured's** business;

    (ii) **Defense Costs;** or

    (iii) a **Claim** related to claims handling or adjusting.

(i)    brought by, on the behalf of or in the right of any **Insured;** provided, however, this exclusion shall not apply to a **Claim** by any **Insured** brought in its capacity as a policyholder or as a customer or client of the **Organization;**

(j)    alleging, arising out of, based upon or attributable to, directly or indirectly, the performance of or failure to perform **Professional Services** for any person or entity which:

    (1)   is owned by any **Insured** or in respect of which the **Insured** has **Management Control;**

    (2)   owns any **Insured** or exercises **Management Control** in respect of any **Insured;** or

    (3)   is affiliated with any **Insured** through any common ownership or **Management Control.**

Provided, however, the above exclusion shall not apply to (a) a **Claim** related to claims handling or adjusting; or (b) a **Claim** by any of the entities referred to at (1) to (3) above brought  in its capacity as a policyholder or as a customer or client of the **Organization;**

(k)    alleging, arising out of, based upon or attributable to, directly or indirectly, the failure to establish or the inadequacy or inaccuracy of claim reserves;

(l)    alleging, arising out of, based upon or attributable to, directly or indirectly, any commingling of funds;

(m)    brought by, on the behalf of or in the right of any pool, association or syndicate (including any officer, director or employee thereof) in which any **Insured** is a participant.

(n)    alleging, arising out of, based upon or attributable to, directly or indirectly, the bankruptcy, insolvency, receivership or liquidation of any **Insured;**

    provided, however, this exclusion shall not apply to **Loss** arising from a **Claim** alleging a **Wrongful Act** of the **Insured** in the rendering or failure to render **Professional Services.**

(o)    brought by, on behalf of or in the right of any reinsurer of the **Insured**; provided, however, this exclusion shall not apply if such **Claim** is made by a reinsurer in its capacity as a policyholder or as a customer or client of the **Organization;**

    provided, however, this shall not apply to a **Claim** related to claims handling or adjusting.

(p)    for any violation of responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any similar provisions of any state, local or foreign statutory or common law, but solely with respect to any employee benefit plan sponsored or established by the **Organization** for the benefit of the **Organization's** employees;

(q)    for any obligation for which the **Insured**, or any carrier as its insurer, may be held liable under any workers' compensation, unemployment compensation, disability benefits law, or under any similar law;

(r)    alleging, arising out of, based upon or attributable to the notarized certification or acknowledgment, or any guarantee of a signature without the physical appearance at the time of said notarization, acknowledgment or guarantee of the person who is or claims to be the person signing the instrument;

(s)    alleging, arising out of, based upon or attributable to any mechanical or electronic failure, breakdown or malfunction of any machine or system of machines; or in any way involving the unauthorized access to any electronic data processing or computer systems of the **Insured;**

    provided, however, that the above exclusion shall not apply to a **Claim** related to claims handling or adjusting.

(t)    alleging, arising out of, based upon or attributable to (1) any failure or inability of the **Security** of the **Insured's** computer system to mitigate loss from or prevent a computer attack; (2)  the physical theft of hardware or firmware in the physical possession of the **Insured** (or components thereof) on which electronic data is stored, by a person other than an **Insured**, from a premises occupied and owned by the **Insured**; or (3) any failure or inability described in (1) or (2), resulting from the theft of a password or access code by non-electronic means in direct violation of the **Insured's** specific written **Security** policies or procedures;

(u)    alleging, arising out of, based upon or attributable to any liability of others assumed by any **Insured** under any waiver, written contract or agreement;

    provided, however, this exclusion shall not apply to:

        (1)    any liability an **Insured** would have in the absence of such contract or agreement; or

        (2)    a **Claim** related to claims handling or adjusting; or

        (3)    **Claims** made against the **Insured** in its capacity as an **Insurance Agent**, **Managing General Agent**, or **Third Party Administrator**;

(v)    alleging, arising out of, based upon or attributable to:

    (1) any actual or alleged purchase, sale, origination, participation, grant, commitment, restructuring, termination, transfer, repossession or foreclosure of any loan, lease or extension of credit, or the failure to do any of the foregoing, or the rendering of advice in connection with any loan, lease or extension of credit;

(2) acting as a **Securities Broker-Dealer**;

(3)  acting as a real estate broker or agent, escrow agent, property manager or title agent;

(4) forming, syndicating, selling, operating, administering, advising, or rolling up a limited partnership, or limited liability company or similar entity, or  real estate investment trust;

(5) the providing of, or failure to provide, investment management or investment advisory services including, without limitation, investment research, investment consulting, portfolio management, fund administration, fund distribution, investment transactions or related investment services, regardless of whether such investment advisory services are performed by a registered investment advisor under the Investment Advisor Act of 1940; or

(6) the **Insured's** actual or alleged oral or written representation, promise or guarantee of the past performance or future value of any insurance or investment product.

(w)　　arising out of, based upon or attributable to, directly or indirectly, war, invasion, act of foreign enemy, hostile operations (whether war has been declared or not), civil war, rebellion, revolution, insurrection, riot or civil commotion assuming the proportions of or amounting to a popular uprising, military or usurped power or martial law.

## 4.    RETENTION

Except where expressly provided to the contrary, the **Insurer** shall be liable only for the amount of **Loss** arising from each **Claim** or group of **Related Claims** that exceeds the Retention amount stated in Item 3 of the Declarations.

A single Retention amount shall apply to each **Claim** or group of **Related Claims**.

## 5. LIMITS OF LIABILITY

The **Policy Aggregate** is the **Insurer's** maximum liability for all **Loss** under this Policy.   Under no circumstances shall the **Insurer** be responsible to pay any **Loss** in excess of the **Policy Aggregate**.

All **Related Claims** that pursuant to the applicable *Notice and Reporting Clause* are considered made or received during the **Policy Period** or **Discovery Period** (if applicable), shall also be subject to the applicable **Limits of Liability** set forth in this policy.   Each of the **Limits of Liability** for the **Discovery Period** (if applicable) shall be part of, and not in addition to, each of the corresponding **Limits of Liability** for the **Policy Period**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Limits of Liability**.   **Defense Costs** are part of **Loss** and as such are subject to the **Limits of Liability** for **Loss**.

## 6. NOTICE AND REPORTING

Notice hereunder shall be given in writing to the **Insurer** at the address indicated in the Declarations. If mailed or transmitted by electronic mail, the date of such mailing or transmission shall constitute the date that such notice was given and proof of mailing or transmission shall be sufficient proof of notice.

(a)   *Reporting a Claim*

(i) An **Organization** or an **Insured** shall notify the **Insurer** in writing as soon as practicable in the form of a list (the **Bordereau**), at 180 and 360 days from the date of the Policy inception (and, in all events no later than 60 days after the end of the **Policy Period** or the **Discovery Period** (if applicable)) after the **Information Holder** first becomes aware of a **Claim** which:

**(a)** in the opinion of the **Information Holder** is likely to result in a **Loss** in excess of 50% of the applicable **Retention**; or

**(b)** is in the form of any proceeding or other court application naming an **Insured**.

The **Bordereau** shall include the names of the claimants, a description of the alleged **Wrongful Act** which forms the basis of the **Claim,** the identity of the **Insureds** responsible, the date the **Insured's Information Holder** became aware of the **Claim** and the nature of the damages sought (if known);

(ii) a **Claim** shall be deemed to have been "first made" on the date on which it first notified the **Insurer** in accordance with paragraph (i) above.

(iii) If the **Insured's Information Holder** subsequently becomes aware of, or has reason to believe that, any **Claim** previously noticed to the **Insurer** by **Bordereau** has an increased probability of resulting in a **Loss** in excess of 50% of the applicable **Retention**, then the **Insureds** shall provide additional notification to the **Insurer** in respect of that **Claim** as soon as practicable upon the **Insured's Information Holder** becoming aware of such increased probability.

(iv)  the **Insurer** waives any right or remedy it may have for any breach of this paragraph by an **Organization** or an **Insured,** save in respect of where this deliberate fraud established by a final, non-appealable adjudication.

(b)   *Relation Back to the First Reported Claim*

Solely for the purpose of establishing whether any subsequent **Related Claim** was first made during the **Policy Period** or **Discovery Period** (if applicable), if during any such period a **Claim** was first made and reported in accordance with Clause 6(a) above, then any **Related Claim** that is subsequently made against an **Insured** and that is reported in accordance with Clause 6(a) above shall be deemed to have been first made at the time that such previously reported **Claim** was first made.

With respect to any subsequent **Related Claim**, this policy shall not cover **Loss** incurred before such subsequent **Related Claim** is actually made against an **Insured**.

(c)   *Relation Back to Reported Circumstances Which May Give Rise to a Claim*

If during the **Policy Period** or **Discovery Period** (if applicable) an **Organization** or an **Insured Person** becomes aware of and notifies the **Insurer** in writing of circumstances that may give rise to a **Claim** being made against an **Insured** and provides details as required below, then any **Claim** that is subsequently made against an **Insured** that arises from such circumstances and that is reported in accordance with Clause 3(a) above shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent

**Claim** was first made during the **Policy Period** or during the **Discovery Period** (if applicable). Coverage for **Loss** arising from any such subsequent **Claim** shall only apply to **Loss** incurred after that subsequent **Claim** is actually made against an **Insured**. In order to be effective, notification of circumstances must specify (where available to the **Insured**) the facts, circumstances, nature of the alleged **Wrongful Act** anticipated and reasons for anticipating such **Claim**, with full particulars as to dates, persons and entities involved; however, notification that includes a copy of an agreement to toll a statute of limitations shall be presumed sufficiently specific as to the potential **Claims** described within that agreement.

## 7. DISCOVERY

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a period of up to six (6) years following the effective date of such cancellation or nonrenewal ("**Discovery Period**"), upon payment of an **Additional Premium Amount** described in the **Declarations**, in which to give written notice to the **Insurer** of: (i) **Claims** first made against an **Insured**; or (ii) circumstances of which an **Organization** or an **Insured** shall become aware, in any such case, during the **Discovery Period** and solely with respect to any **Wrongful Acts** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  The Additional Premium Amount for: (a) one year shall be no more than 125% of the Full Annual Premium; and (b) two to six years shall be an amount to be determined by the Insurer. As used herein, "Full Annual Premium" means the premium level in effect for this Policy immediately prior to the end of the Policy Period.

In the event of a **Transaction**, the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction** and otherwise covered by this policy.  The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide.  In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

If the **Named Entity** exercises its right to purchase a **Discovery Period**, that period incepts at the end of the **Policy Period** or, if purchased in the event of a **Transaction**, as of the effective time of such **Transaction.**

The right to purchase a **Discovery Period** shall terminate unless written notice of election, together with any additional premium due, is received by the **Insurer** no later than thirty (30) days after the effective date of the cancellation, nonrenewal or **Transaction.**

Any **Discovery Period** is not cancelable and the additional premium charged is non-refundable in whole or in part.  This *Discovery Clause* shall not apply to any cancellation resulting from non-payment of premium.

## 8. DEFENSE AND SETTLEMENT

(a) *No Duty to Defend or Investigate* — The **Insureds** shall defend and contest any **Claim** made against them. The **Insurer** does not assume any duty to defend or investigate.

(b) *Advancement* — Once the **Insurer** has received written notice of a **Claim** under this **Policy**, it shall advance, excess of any applicable Retention, covered **Defense Costs** on a current basis, but no later than sixty (60) days after the **Insurer** has received itemized bills for those **Defense Costs**. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured**, severally according to its, his or her respective interest, in the event and to the extent that any such **Insured** shall not be entitled under this **Policy** to payment of such **Loss**.

(c) *Claims Participation and Cooperation* — The **Insurer** shall have the right, but not the obligation, to fully and effectively associate with each and every **Insured** in the defense and prosecution of any **Claim** that involves, or appears reasonably likely to involve, the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Organization** and **Insured Person** shall give the **Insurer** full cooperation and such information as it may reasonably require.

The failure of any **Insured Person** to give the **Insurer** cooperation and information as required in the preceding paragraph shall not impair the rights of any other **Insured Person** under this **Policy**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any **Defense Costs** in excess of 25% of the Retention, without the prior written consent of the **Insurer**, which consent shall not be unreasonably withheld.

(d) *Settlement Within Retention/ Consent Waived* — If all **Insured** defendants are able to dispose of all **Claims** that are subject to one Retention (inclusive of **Defense Costs**) for an amount not exceeding 50% of the Retention, then the **Insurer's** consent shall not be required for such disposition.

## 9. CHANGES TO INSUREDS

*A.     Transactions*

In the event of a **Transaction**, this policy shall continue in full force and effect only as to **Wrongful Acts**, occurring prior to the effective time of the **Transaction** and otherwise covered by this policy, and no portion of the premium paid for this policy shall be refundable. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 4 above.

This policy may not be canceled after the effective time of the **Transaction**.

Notwithstanding the foregoing, this policy may continue in full force and effect as to **Wrongful Acts**, occurring subsequent to the effective time of the **Transaction** and otherwise covered by this policy, if:

(a)     within thirty (30) days subsequent to the effective time of such **Transaction** the **Insurer** has been provided with full particulars of the **Transaction**, the related entity(ies) and any other

information requested by the **Insurer**; and

(b)    the **Insurer** waives the restrictions set forth above with respect to such **Transaction** by written endorsement to this policy and the **Named Entity** or its successor has paid any additional premium and accepted any amendments to this policy required by the **Insurer**.

### B. *Subsidiary Additions*

In addition to the definition of "**Subsidiary**" set forth in Clause 11. *Definitions* of this **Policy**, **Subsidiary** also means any entity: (i) of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and (ii) whose assets amount to:

(a)    less than 25% of the total consolidated assets of each and every **Organization** as reported in the **Named Entity's** audited financial statements as of the **Inception Date** of this policy; or

(b)    25% or more of those total consolidated assets, but such entity shall be a "**Subsidiary**" only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, whichever expires or ends first (the "**Auto-Subsidiary Period**");

The **Insurer** shall extend coverage for any **Subsidiary** described in subparagraph (b) above, and any **Insured Person** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy required by the **Insurer** relating to such **Subsidiary**..

### C. *Former Subsidiaries*

In the event the **Named Entity** loses **Management Control** of a **Subsidiary** during or prior to the **Policy Period**, coverage with respect to such **Subsidiary** and its **Insured Persons** shall continue until termination of this **Policy** but only with respect to **Claims** for **Wrongful Acts** that occurred or are alleged to have occurred during the time that the **Named Entity** had **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**.

### D. *Scope Of Subsidiary Coverage*

Coverage as is afforded under this policy with respect to a **Claim** made against any **Subsidiary** and/or any **Insured Person** thereof shall only apply for **Wrongful Acts** committed or allegedly committed during the time that such **Subsidiary** and such **Insured Person** meet the respective definitions of **Subsidiary** and **Insured Person** set forth in this **Policy**.

## 10.   OTHER INSURANCE

A. This policy shall apply in excess of any other existing valid and collectible professional liability insurance policy including any self-insured retention or deductible portion thereof whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, and regardless or not if any **Loss** in connection with a **Claim** is collectible or recoverable under such other policy, unless such other policy is written only as a specific excess insurance over the Limits of Liability of this Policy.

B. This policy shall always apply primary to any other valid and collectible reinsurance available to the **Insured** including, for the avoidance of doubt, any valid and collectible reinsurance affording cover for "extracontractual obligations claims" and/or "claims that are in excess of an underlying policy's limits of liability" ("**ECO/XPL claims**").

11.  SUBROGATION

To the extent of any payment under this **Policy**, the **Insurer** shall be subrogated to all **Insureds'** rights of recovery. Each **Organization** and each **Insured Person** shall execute all papers reasonably required and provide reasonable assistance and cooperation in securing or enabling the **Insurer** to exercise subrogation rights or any other rights, directly or in the name of the **Organization or** any **Insured Person**.  In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured**.

12.  RECOVERY OF LIMITS

In the event the **Insurer** recovers amounts it paid under this policy, the Insurer shall reinstate the **Limits of Liability** of this policy to the extent of such recovery, less its costs incurred in administering and obtaining such recovery.  The **Insurer** assumes no duty to seek a recovery of any amounts paid under this policy.

13. SERVICE OF SUIT

If the **Insurer** fails to pay any amount claimed to be due under this **Policy**, the **Insurer**, at the request of any of the **Insureds**, will submit to the jurisdiction of any court of competent jurisdiction within the United States, and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be understood to constitute a waiver of the **Insurer's** rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

The **Insurer** hereby designates the Superintendent, Commissioner or Director of Insurance or similar officer specified by law for that purpose, or his or her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any **Insured** under the Policy. Upon receipt of process lawfully served, that official may mail such process to Claim Manager – Professional Liability at the address stated at Item 6 of the Declarations.

14. APPLICATION

The **Insurer** has relied upon the accuracy and completeness of the statements and representations contained in the **Application**. The **Application** will be construed a separate application for coverage by each **Insured Person**. All such statements and representations are the basis for this **Policy** and are to be considered as incorporated into this **Policy**.

With respect to the **Application,** knowledge possessed by any **Organization** or **Insured Person** shall not be imputed to any **Insured Person** for the purpose of determining coverage under this Policy. Under no circumstances shall coverage provided by this policy for non-indemnifiable **Loss** be deemed void, whether by rescission or otherwise.

15.  CANCELLATION

(a) *By Named Entity*:  This policy may be canceled by the **Named Entity** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer's** authorized agent or to the **Insurer**.

(b) *By the Insurer*:  This policy may be canceled by the **Insurer** only in the event of non-payment of premium by delivering to the **Named Entity** by registered, certified or other first class mail, at the **Named Entity Address**, written notice stating when, not less than fifteen (15) days, the

cancellation shall be effective.  Proof of mailing or delivery of such notice as aforesaid shall be sufficient proof of notice and this policy shall be deemed canceled as to all **Insureds** at the date and hour specified in such notice.

(c) *Return of Premium*:  If this policy shall be canceled, the **Insurer** shall retain the pro rata proportion of the premium hereon.

## 16. NOTICE AND AUTHORITY

Except for the giving of a notice of **Claim**, which shall be governed by the *Notice and Reporting Clause*, all notices required under this policy to be given by an **Insured** to the **Insurer** shall be given in writing to the **Insurer** at the **Insurer Address**.  It is agreed that the **Named Entity** shall act on behalf of all **Insureds** with respect to the giving of notice of a **Claim** or circumstances, the giving and receiving of notice of conditional renewal, premium increase, nonrenewal and cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a **Claim** or circumstance to the **Insurer**, and the exercising or declining to exercise any right to a **Discovery Period**.

## 17. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**.

## 18. ACTION AGAINST INSURER

No action shall lie against the **Insurer** unless there shall have been material compliance with all of the terms of this policy, nor until the amount of an **Insured's** obligation to pay shall have been finally determined either by judgment against such **Insured** after actual trial or by written agreement of such **Insured**, the claimant and the **Insurer**.

Any **Insured** or the legal representative thereof who has secured such judgment or written agreement shall be entitled thereafter to recover under this policy to the extent of the insurance afforded by this policy.  No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against an **Insured** or the **Named Entity** to determine an **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured** or by any spouse, domestic partner or legal representative thereof.

## 19. BANKRUPTCY

Bankruptcy or insolvency of any **Insured** or of their estates shall not relieve the **Insurer** of any of its obligations under this policy.

In such event, the **Insurer** and each **Insured** agree to cooperate in any efforts by the **Insurer** or any **Insured** to obtain relief for the benefit of the **Insured Persons** from any stay or injunction applicable

to the distribution of the policy proceeds.

## 20. EXTENSIONS

*Worldwide Territory*

The coverage afforded by this policy shall apply anywhere in the world.

## 21. CONFORMANCE TO LAW

In the event that there is an inconsistency between: (i) any period of limitation in this policy relating to the giving of notice of cancellation or discovery/extended reporting election, and (ii) the minimum or maximum period required by applicable law, where such law allows, the Insurer will resolve the inconsistency by applying the notice period that is more favorable to the **Insureds**.  Otherwise, the notice period is hereby amended to the extent necessary to conform to applicable law.

## 22. CURRENCY

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

## 23. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

## 24. US ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

## Endorsements

### Tie-in of Limits Endorsement

It is hereby understood and agreed that the amount set forth in Item 3 of the Policy Declarations shall be the maximum aggregate Limit of Liability of the **Insurer** under the **Combined Policies** for all **Claims** arising from any **Wrongful Act.**

Any payment by the **Insurer** under the **Combined Policies** shall reduce the Limit of Liability accordingly by

the paid amount.

With respect to this endorsement, **Combined Policies** shall mean:

- Section One of this Policy (Policy Number: B0901LI1837279). issued to Gemini Financial Holdings, LLC.; and
- Insuring Agreement C of Policy Number: B0901LI1837278 issued to Gemini Re, LLC.

All other terms, conditions and limitations remain unchanged.

### No Liability Endorsement (Lloyd's Syndicate Talbot TAL 1183)

If is hereby understood and agreed that in no way shall Lloyd's Syndicate Talbot TAL 1183 be liable to make payment for any **Loss** for any **Claims** under Section One: Insurance Company Professional Liability of this Policy issued to Gemini Financial Holdings, LLC (Policy Number: B0901LI1837279).

All other terms, conditions and limitations remain unchanged.

**Section Two: Directors & Officers Liability and Fiduciary Liability Insurance.**

**DECLARATIONS**

NOTICE: THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY SUBJECT TO ITS TERMS.

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Insureds** and Underwriters.

| Underwriters: | Lloyd's Syndicate AUL 1274, TAL 1183 and Vertex | Policy Number: B0901LI1837279 |
|---|---|---|

Item 1.   **Named Insured**: Gemini Financial Holdings, LLC.

4300 Northcorp Parkway
Suite 400
Palm Beach Gardens
FL 33410
United States of America

Item 2.   **Policy Period**:   From:   25th December 2018   To:   25th December 2019

Both dates at 12:01 a.m. Local Time at the Principal Address stated in Item 1.

Item 3.   **Clauses Forming This Policy**

Policy Terms and Conditions (F00041 042008 ed.)
Private Organization Directors, Officers and Entity Liability Clause (F00043 042008 ed.)
Fiduciary Liability Clause (F00040 042008 ed.)

Item 4.   **Aggregate Limit(s) of Liability**

Limits of Liability applicable to each clause are shared or separate under this Policy as indicated:

X         Shared
☐         Separate (Other than sublimits as indicated)
☐         Not Applicable

| Clause | Aggregate Limit of Liability for the **Policy Period** |
|---|---|
| All Coverages Under This Policy | USD 10,000,000 |
| Employment Practices Liability Clause | Not Covered |
| Third Party Wrongful Acts Sublimit | Not Covered |
| Private Organization Directors, Officers and Entity Liability Clause | USD 10,000,000 |
| Fiduciary Liability Clause | USD 1,000,000 |
| HIPAA Sublimit | USD 250,000 |
| Section 502(c) Penalties: | USD 250,000 |
| Health Care Reform Penalties: | USD 250,000 |
| Pension Protection Act Penalties: | USD 250,000 |
| Additional Side A D&O Limit of Liability | Not Covered |
| Additional Defense Limit of Liability | Not Covered |
| Derivative Demand Sublimit | USD 250,000 |
| Employment Event Sublimit | Not Covered |

Item 5.     **Retention(s)**

| Clause | Retention each **Claim**: |
|---|---|
| Employment Practices Liability Clause | Not Covered |
| Private Organization Directors, Officers and Entity Liability Clause | USD100,000 |
| Fiduciary Liability Clause | USD 10,000 |

Item 6.     **Premium:**     USD 65,000

Item 7.     **Optional Extension Period**

a.     Premium for **Optional Extension Period:**

1 year at 100%; 3 years at 150%; 6 years at 200% of the total annual premium for the Policy

b.     Length of **Optional Extension Period:**

1 year, 3 years or 6 years.

Item 8.     **Notification Under This Policy**

a.   Notification pursuant to Clause IX. shall be given to:

Insurers via JLT Specialty Limited:
The St Botolph Building
138 Houndsditch
London EC3A 7 AW

b.   All other notices under this Policy shall be given to:

Insurers via JLT Specialty Limited:
The St Botolph Building
138 Houndsditch
London EC3A 7 AW

Item 9.     **Pending or Prior Litigation Date(s)**

| Clause | Date: |
|--------|-------|
| Employment Practices Liability Clause | Not Covered |
| Private Organization Directors, Officers and Entity Liability Clause | 25th October 2009 in respect of USD 1,000,000 in the aggregate limit; 14th September 2015 in respect of USD 4,000,000 in the aggregate limit in excess of USD 1,000,000 in the aggregate limit; |
| | 25th October 2009 |
| Fiduciary Liability Clause | |

Item 10.   **Terrorism Coverage:**

Coverage Purchased: ☐ Yes   X No

If "Yes", Terrorism Coverage Premium: N/A

Item 11.   **Endorsements Effective at Inception**

- Tie-in of Limits Endorsement, as attached.

The Underwriters have caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Underwriters.

## POLICY TERMS AND CONDITIONS

In consideration of the payment of the premium, in reliance on all statements made in the **Application**, and subject to all of the provisions of this Policy, Underwriters and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

### I. DEFINITIONS

The following terms whenever used in this Clause in boldface type shall have the meanings indicated. Terms not defined below, but appearing in boldface type shall have the meanings indicated in the applicable Clause.

A      **"Application"** means:

     1. the application, including any written materials attached thereto, provided to the Insurer by or on behalf of an **Insured** in connection with the underwriting of this Policy; and

     2. each and every public filing by or on behalf of the **Insured Organization**, including any filings with the U.S. Securities Exchange Commission or any similar federal, state, local, or foreign regulatory agency, provided that such public filing was filed during the 12 month period immediately precding the inception of the **Policy Period.**

B      **"Change of Control"** means:

     1. the acquisition by any person or entity of more than 50% of the outstanding securities or equity interest of the **Named Insured** representing the present right to vote for the election of directors or **Managers**; or

     2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity.

C.      **"Financial Impairment"** means the appointment by any state or federal official, agency or court of any receiver, trustee, examiner, conservator, liquidator, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Insured Organization.**

D.      **"Insured Organization"** means the **Named Insured** and its **Subsidiaries**, including any such organization as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

E.      **"Interrelated Wrongful Acts"** means any and all **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

F.      **"Managers"** means all persons who were, now are, or shall be managers, managing members, members of the board of managers, managing partners, general partners of a limited partnership (including the board of directors of any such general partner that is a corporation) or equivalent executives of any **Insured Organization**.

G.      **"Named Insured"** means the entity designated in Item 1. of the Declarations.

H.      "**Optional Extension Period**" means the period described in Clause XI. of the Policy Terms and Conditions.

I.  **"Policy Period"** means the period from the effective date and hour of this Policy to the Policy expiration date and hour as set forth in Item 2. of the Declarations, or its earlier termination, if any.

J.  **"Pollutants"** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapour, soot, fumes, acids, alkalis, mold, spores, fungi, germs, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odour, waste water, oil or oil product, infectious or medical waste, asbestos or asbestos product, lead or lead product, noise, and electric, magnetic or electromagnetic field.

K.  **"Subsidiary"** means:

1. any entity, while more than 50% of the outstanding voting securities representing the present right to vote for the election of such entity's directors are owned by the **Named Insured** directly or indirectly;

2. any limited liability corporation while the right to elect or otherwise appoint or designate more than 50% of such limited liability corporation's **Managers** is owned or controlled by the **Named Insured** directly or indirectly; or

3. any joint venture, which is a corporate entity, while the **Named Insured** has managerial control, or while the right to elect or otherwise appoint more than 50% of such entity's directors, trustees or other equivalent executive is owned or controlled by the **Named Insured** directly or indirectly

## II. EXCLUSIONS

The Underwriters shall not be liable to make any payment for Loss in connection with that portion of any Claim:

A. based upon, arising out of or attributable to any demand, suit, or other proceeding pending, against any **Insured** on or prior to the applicable Pending or Prior Litigation Date set forth in Item 9. of the Declarations, or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein.

B. based upon, arising out of or attributable to any **Wrongful Act** or any fact, circumstance, transaction or situation which has been the subject of any notice and accepted as notice of a **Claim, Inquiry** or notice of a potential **Claim** or **Inquiry** given prior to the **Policy Period** under any other directors and officers, employement practices or fiduciary liability policy.

With respect to all Policy exclusions in all Coverage Clauses, the facts pertaining to or knowledge of any **Insured** shall not be imputed to any other **Insured Person** and only the facts pertaining to or knowledge of the Chief Executive Officer or Chief Financial Officer shall be imputed to any **Insured Organization**.

## III. LIMITS OF LIABILITY

A. Aggregate Limit(s) of Liability

The amount(s) shown in Item 4. of the Declarations shall be the Underwriters' maximum aggregate limit(s) of liability under the Policy.

B. Additional Defense Limit of Liability

If purchased as indicated in Item 4. of the Declarations, the applicable amount shown in Item 4. shall be the Additional Defense Limit of Underwriters applicable only to **Defense Costs** which Limit shall be separate and in addition to any other limit shown in Item 4. of the Declarations. Payment of **Defense Costs** shall erode the Additional Defense Limit first and will not erode any other limit shown in Item 4. until the Additional Defense Limit is exhausted.

D. The payment of **Defense Costs** by Underwriters reduces and may totally exhaust the applicable Limit(s) of Liability.

E. More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times:

1. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

2. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** was reported under this Policy or any other policy providing similar coverage, regardless of whether such date is before or during the **Policy Period**.

F. If all aggregate limit(s) of liability are exhausted, Underwriters' obligations under this Policy shall be completely fulfilled and extinguished.

## IV. RETENTIONS

A. Underwriters shall be liable for only that part of **Loss** arising from a **Claim** which is excess of the applicable Retention set forth in Item 5. of the Declarations.Any payments made to satisfy the retention or deductible under another policy of insurance shall not satisfy or apply towards the applicable Retention, or any portion thereof, under this Policy. The Retention shall not apply, however, if indemnification by the **Insured Organization** is not permitted by law or if the **Insured Organization** is not able to indemnify for any reason.

B. In the event more than one of the Insuring Clauses are applicable to a **Claim**, the Retentions set forth in Item 5. of the Declarations shall be applied separately to that part of the **Loss** resulting from such **Claim**. The sum of the Retentions so applied shall constitute the Retention applicable to such **Claim**. The total Retention as finally determined shall in no event exceed the largest of the Retentions applicable to Insuring Clauses that are applicable to such **Claim.**

## V. SETTLEMENT AND DEFENSE

A. The **Insured** shall have the right and duty to defend any **Claim** made against them. The **Insurer** does not assume any duty to defend.

It is further understood and agreed that the **Insurer** shall defend any **Claim** made against the **Insured**, if the **Insured**, notifies the **Insurer,** in writing, within 30 days of a **Claim** made against them, subject to Section II(VII) Notification.

B.Once the **Insurer** has received written notice of a **Claim** under this Policy, it shall advance, excess of any applicable **Retention**, **Defense Costs** on a current basis, but no later than sixty (60) days after the **Insurer** has received itemized bills for those **Defense Costs**.  Such advance payments by the **Insurer** shall be repaid to the Insurer by each and every Insured, severally according to its, his or her respective interest, in the event and to the extent that it is finally

established that any such Insured shall not be entitled under this **Policy** to payment of such **Defense Costs**.

C. The **Insurer** shall have the right, but not the obligation, to fully and effectively associate with each and every Insured in the defense of any **Claim** that involves, or appears reasonably likely to involve, the Insurer, including, but not limited to, negotiating a settlement.  Each and every **Organization** and **Insured Person** shall give the Insurer full cooperation and such information as it may reasonably require.

The failure of any **Insured Person** to give the Insurer cooperation and information as required in the preceding paragraph shall not impair the rights of any other Insured Person under this Policy. The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any **Defense Costs** in excess of 25% of the **Retention**, without the prior written consent of the Insurer, which consent shall not be unreasonably withheld.

D.If all **Insured** defendants are able to dispose of all **Claims** that are subject to one Retention (inclusive of **Defense Costs**) for an amount not exceeding 50% of the **Retention**, then the Insurer's consent shall not be required for such disposition.

## VI. ALLOCATION

If a **Claim** made against any **Insured** includes both covered and uncovered matters, or is made against an **Insured** and any other parties not insured by this **Policy**, the **Insured** and the **Insurer** shall use their best efforts to agree upon a fair and reasonable allocation between the insured and uninsured **Loss**. In the event that an allocation cannot be agreed to, then Underwriters shall make an interim payment of the amount of **Loss** that the parties agree is not in dispute until a final amount is agreed upon or determined by applicable law.

## VII. SPOUSAL AND DOMESTIC PARTNER EXTENSION

Coverage under this Policy will apply to an **Insured Person's** lawful spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, or local law in the United States, but solely by reason of such spousal status or such spouse's ownership interest in property or assets that are sought as recovery for **Wrongful Acts**.

## VIII. NOTIFICATION

A. In the event the Chief Executive Officer, Chief Financial Officer or Chief Actuary (or equivalent position) of the **Insured Organization** becomes aware that a **Claim** or **Inquiry** has been made against any of the **Insureds**, the **Insureds** shall give to Underwriters notice in writing of such **Claim** or **Inquiry** as soon as practicable provided all **Claims** and **Inquiries** must be reported no later than ninety (90) days after the expiration of the **Policy Period or  Optional Extension Period** (if applicable).

B. If the **Insureds** fail to provide timely notice to the Insurer as specified above, the **Insurer** shall not be entitled to deny coverage based solely upon late notice unless the **Insurer** can demonstrate its interests were materially prejudiced by reason of such late notice.

C. If during the **Policy Period**, except for the **Optional Extension Period**, the Chief Executive Officer, Chief Financial Officer or Chief Actuary (or equivalent position) of the **Insured Organization** first become aware of circumstances that may reasonably be expected to give rise to a  and if the Chief Executive Officer, Chief Financial Officer or Chief Actuary (or equivalent

position) of the **Insured Organization** during the **Policy Period**, except for the **Optional Extension Period**, give written notice to Underwriters as soon as practicable of:

1. the specific **Wrongful Act** allegations anticipated;

2. the consequences which have resulted or may result therefrom; and

3. the circumstances by which the **Insureds** first became aware thereof,

then any **Claim** or **Inquiry** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Policy to have been made at the time such notice was first given.

Underwriters shall have no obligation to cover any amounts, including any legal fees or expenses, incurred prior to the time such circumstances result in a **Claim** or **Inquiry**.

D. Notice to Underwriters provided for in Clause VIII.A. and C. shall be given to the firm shown in Item 8.(a) of the Declarations. All other notices to Underwriters under this Policy shall be given to the firm shown in Item 8.(b) of the Declarations. All notices under any provision of this Policy must be made in writing. Notices given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee.

## IX. GENERAL CONDITIONS

A.  Representations.

The **Insureds** represent that the statements and particulars contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any **Insured Persons**.

In the event that any such statements in the **Application** are inaccurate and incomplete and were made with the intent to deceive or materially affected the acceptance of the risk assumed by the Underwriters under this **Policy**, this **Policy** will be void ab initio with respect to:

a. any **Insured Person** who had actual knowledge, prior to the **Policy Period**, of the facts that were inaccurate and incomplete,

b. any **Insured Organization,** if the Chief Executive Officer orChief Financial Officer  had actual knowledge, prior to the Policy Period, of the facts that were inaccurate and incomplete**.**

In no event, however, shall coverage under Insuring Agreement I. A. of the Private Organization Directors, Officers and Entity Liability Clause be rescinded or voided, in whole or in part.

B.Changes to Insureds

1.  Merger or Acquisition of Insured Organization

In the event of a **Change of Control** after the inception date of this Policy or of any policy issued by Underwriters of which this Policy is a renewal or replacement, this Policy,

subject to its terms, shall continue to apply to the **Insureds** but only with respect to any **Wrongful Act** committed or allegedly committed prior to the **Change of Control.**

2. Acquisition of a Subsidiary

   a. Except as set forth in the following paragraph b., if before or during the **Policy Period** any entity qualifies as a **Subsidiary**, then such **Subsidiary**, its **Insured Persons** and **Insured Entities** (if any) shall be **Insureds**, but only with respect to **Wrongful Acts** occurring or allegedly occurring after such entity qualified as a **Subsidiary**.

   b. If an entity first qualifies as a **Subsidiary** during the **Policy Period** and if at that time such **Subsidiary's** total assets exceed twenty-five percent (25%) of the total consolidated assets of the **Insured Organization** as set forth in the **Insured Organization's** most recent audited consolidated financial statements, then coverage under this Policy for such **Subsidiary** and its **Insured Persons** as set forth in the preceding paragraph shall cease ninety (90) days after such entity first qualifies as a **Subsidiary** unless**:**
      i. within such ninety (90) day period the **Insured Organization** provides the **Insurer** with written notice of such qualification;
      ii. the **Insured Organization** and the **Insurer** agree on any revisions to the Policy either party may require; and
      iii. the **Insured Organization** pays any additional premium required by the **Insurer** as a result of the addition of the new **Subsidiary.**

3. Cessation of a Subsidiary

If during or prior to the **Policy Period** any entity ceases to be a **Subsidiary**, then coverage for such former **Subsidiary** and its **Insured Persons** under this Policy shall only be available, subject to all other terms and conditions of this Policy, for **Wrongful Acts** occurring or allegedly occurring prior to the date it ceased to qualify as a **Subsidiary**.

C. Cancellation/Nonrenewal

1. By acceptance of this Policy, the **Insureds** hereby confer the exclusive power and authority to cancel this Policy on their behalf to the **Named Insured**. Such entity may cancel this Policy by surrender thereof to Underwriters, or by mailing to Underwriters written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice shall be equivalent to mailing.

2. Underwriters may cancel this Policy only for non-payment of premium by mailing to the **Named Insured** written notice stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by Underwriters shall be equivalent to mailing.

3. If this Policy is cancelled pursuant to 1 or 2. hereinabove, Underwriters shall retain the pro rata proportion of the premium hereon. Payment or tender of any unearned

premium by Underwriters shall not be a condition precedent to the effectiveness of cancellation.

4. Underwriters may non renew this Policy by mailing to the **Named Insured** written notice of nonrenewal not less than sixty (60) days before the end of the **Policy Period**. The mailing of such notice shall be sufficient notice. Delivery of such written notice by Underwriters shall be equivalent to mailing.

D.Other Insurance

This Policy shall apply in excess of any other existing valid and collectable management liability policy including any self Insured retention or deductible portion thereof, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, and regardless of whether or not any **Loss** in connection with such **Claim** is collectible or recoverable under such other policy, unless such other policy is written only as specific excess insurance over the Limits of Liability of this Policy.

## X. OPTIONAL EXTENSION PERIOD

A. If this Policy is cancelled by the **Named Insured** or if Underwriters non renew this Policy, then the **Named Insured** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item 7.a. of the Declarations of the total annual premium for this Policy, to an extension of the coverage granted by this Policy with respect to any **Claim** first made during the period of time set forth in Item 7.b. of the Declarations after the end of the **Policy Period**, but only with respect to any **Wrongful Act** committed before the effective date of cancellation or nonrenewal.

B. As a condition precedent to the right to purchase the **Optional Extension Period**, the total premium for this Policy must have been paid. The right to purchase the **Optional Extension Period** shall terminate unless written notice together with full payment of the premium for the **Optional Extension Period** is given to Underwriters within thirty (30) days after the effective date of cancellation or nonrenewal. If such notice and premium payment is not so given to Underwriters, there shall be no right to purchase the **Optional Extension Period**.

C. In the event of the purchase of the **Optional Extension Period**, the entire premium for the **Optional Extension Period** shall be deemed earned at its commencement.

D. The exercise of the **Optional Extension Period** shall not in any way increase the Limit(s) of Liability of Underwriters.

E.The offer of renewal terms, conditions or premiums different from those in effect prior to renewal shall not constitute a refusal to renew for purposes of this Clause X.

## XI. ASSISTANCE, COOPERATION AND SUBROGATION

The **Insureds** agree to provide Underwriters with such information, assistance and cooperation as Underwriters or their counsel may reasonably request, and they further agree that they shall not take any action which in any way increases Underwriters' exposure under this Policy.

In the event of any payment under this Policy, Underwriters shall be subrogated to the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights including the execution of such documents as are necessary to enable Underwriters effectively to bring suit in their name, and shall provide all other assistance and cooperation which Underwriters may reasonably require. In no event, however, shall the underwriters exercise its rights of subrogation

against any **Insured Persons.** If the Insurer recovers, either through subrogation or recoupment, any portion of an amount paid under this Policy, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## XIII. ACTION AGAINST UNDERWRITERS

No action shall lie against Underwriters unless, as a condition precedent thereto, the **Insureds** shall have fully complied with all of the terms of this Policy, and the amount of the **Insureds'** obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and Underwriters. Nothing contained herein shall give any person or organization any right to join Underwriters as a party to any **Claim** against the **Insureds** to determine their liability, nor shall Underwriters be impleaded by the **Insureds** or their legal representative in any **Claim**.

## XIV. ENTIRE AGREEMENT

By acceptance of this Policy, the **Insureds** agree that this Policy embodies all agreements existing between them and Underwriters or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Underwriters shall not effect a waiver or a change in any part of this Policy or estop Underwriters from asserting any right under the terms of this Policy, nor shall the terms be waived or changed except by written endorsement or rider issued by Underwriters to form a part of this Policy.

## XV. TERRITORY

This Policy shall apply to **Claims** made against the **Insureds** anywhere in the world.

## XVI. VALUATION AND CURRENCY

All premiums, limits, Retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Loss** is due.

## XVII. BANKRUPTCY

Bankruptcy or insolvency of the **Insureds** shall not relieve Underwriters of their obligations nor deprive Underwriters of their rights or defences under this Policy.

## XVIII. AUTHORIZATION

By acceptance of this Policy, the **Named Insured** agrees to act on behalf of the **Insureds** with respect to the giving and receiving of any notice provided for in this Policy, the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements, and the **Insureds** agree that the **Named Insured** shall act on their behalf.

## XVIIII. HEADINGS

The descriptions in the headings and subheadings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

## PRIVATE ORGANIZATION DIRECTORS, OFFICERS AND ENTITY LIABILITY CLAUSE

### I. INSURING CLAUSES

A. The Underwriters shall pay on behalf of the **Insured Persons** all **Loss** which is not indemnified by the **Insured Organization** resulting from any **Claim** first made against the **Insured Persons** and reported in writing to the Underwriters during the **Policy Period** or **Optional Extension Period**, if applicable, for a **Wrongful Act**.

B. The Underwriters shall pay on behalf of the **Insured Organization** all **Loss** which the **Insured Organization** is required or permitted to pay as indemnification to any of the **Insured Persons** resulting from any **Claim** first made against the **Insured Persons** and reported in writing to the Underwriters during the **Policy Period** or **Optional Extension Period**, if applicable, for a **Wrongful Act.**

C. The Underwriters shall pay on behalf of the **Insured Organization** all **Loss** resulting from any **Claim** first made against the **Insured Organization** and reported in writing to the Underwriters during the **Policy Period** or **Optional Extension Period**, if applicable, for a **Wrongful Act.**

D.

1. The Underwriters shall pay on behalf of the **Insured Organization** all **Costs of Investigation** subject to a $250,000 aggregate sublimit of liability

**2.** incurred by an **Insured Organization** or on its behalf by any **Executive Officer** of **the Insured Organization** (including through any special committee) as **Defense Costs** in seeking the dismissal of any **Derivate Suit** against an **Insured.**

E. The Underwriters shall pay on behalf of the **Insured Persons** all **Loss** resulting from any **Claim** first made against the **Insured Persons** and reported in writing to the Underwriters during the **Policy Period** or **Optional Extension Period**, if applicable, for a **Wrongful Act** committed while serving in an **Outside Executive Position.**

The coverage afforded by this Insuring Clause shall be specifically excess of any indemnification and insurance available to such **Insured Persons** from the **Outside Entity.**

### II. DEFINITIONS

The following terms whenever used in this Clause in boldface type shall have the meanings indicated.

Terms not defined below, but appearing in boldface type shall have the meanings indicated in the Policy Terms and Conditions.

B. **"Claim"** means:

1. a written demand for monetary damages, non-monetary, or injunctive relief against any of the **Insureds**, to toll or waive a statute of limitations or to engage in an arbitration, mediation or other alternative dispute resolution proceeding which shall be deemed first made upon receipt by the **Insured** of such demand;

2. a civil, criminal, administrative, investigative or regulatory proceeding initiated against any of the **Insureds** commenced by:

a. the service of a complaint or similar pleading upon the **Insured**;

b. the receipt by an **Insured** of a filing of a notice of charges, investigative order or similar document; or

c. the receipt by an **Insured** of a written notice or subpoena from an investigatory authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced, including a notice of investigation, target letter, Wells Notice or similar document;

3.  for the purpose of coverage afforded under Insuring Clause I.D., a **Derivative Demand** which shall be deemed first made upon receipt by the **Insured Organization** of such demand;

4. an official request for the Extradition of an Insured Person, or the execution of a warrant for the arrest of an Insured Person where such execution is an element of Extradition, which shall be deemed first made upon receipt of the request or warrant.

C. **"Costs of Investigation"** means reasonable legal fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of the **Insured Persons** or the **Insured Organization's** overhead expenses) incurred by the **Insured Organization, or on behalf of the Insured Organization by** its board of directors (or the equivalent management body or any committee of its board of directors (or equivalent management body) (including, but not limited to, a Special Litigation Committee) in connection with the investigation or evaluation of any **Derivative Investigation.**

D. **"Defense Costs"** means reasonable fees costs and expenses which are incurred by or on behalf of the **Insureds** in defending, settling, appealing or investigating any **Claim** and the cost of appeal, supersedeas, injunction, attachment or similar bonds (provided, however, the Underwriters shall have no obligation to apply for or furnish any bond for appeal, supersedeas, injunction, attachment or any similar purpose), including reasonable fees, costs and expenses incurred by the **Insureds** at the Underwriters request to assist the Underwriters in investigating a **Claim. Defense Costs**shall not include salaries, regular or overtime wages, fees or benefit expenses associated with **Insured Persons** or the **Insured Organization's** overhead expenses. **Defense Costs** means only "**Costs of Investigation**" for the purpose of coverage afforded under Insuring Clause I.D.

E. **"Derivative Demand"** means a written demand by one or more owners of voting securities of the **Insured Organization** upon the board of directors of the **Insured Organization** to bring a civil proceeding in a court of law against any of the **Insured Persons** for a **Wrongful Act**.

F.**Derivative Investigation** means, after receipt by any Insured of a **Claim** that is either a **Derivative Suit** or **Derivative Demand**, any investigation conducted by the **Insured Organization**, or on behalf of the **Insured Organization** by its board of directors (or the equivalent management body) or any committee of the board of directors' (or equivalent management body) (including but not limited to, a Special Litigation Committee), as to how the **Insured Organization** should respond.

G"**Derivative Suit**" means a lawsuit purportedly brought derivatively on behalf of an **Insured Organization** by a shareholder of such **Insured Organization** against an **Executive Officer** of the **Insured Organization**, including any such lawsuit naming such **Insured Organization** as a nominal defendant

H.**"Executive Officer"** means the chairperson, chief executive officer, chief operating officer, president, **Manager**, chief financial officer, in-house general counsel, risk manager, human resources staff or an individual acting in a similar capacity with the **Insured Organization**.

I.**"Insureds"** means the **Insured Persons** and the **Insured Organization**.

J. **"Insured Persons"** means all persons who were, now are, or shall be duly elected or appointed directors, officers, trustees or **Managers** of the **Insured Organization** including all persons outside the United States serving in a functionally equivalent role for the **Insured**

**Organization** including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy. **Insured Persons** also means the following individuals:

Jeff Scott, President
Dutta Subhashish, President Gemini Re
Peter Forester Chief Actuary
Lyle Freedman, Chief Technology Officer
Jennifer Gravelle, Chief Financial Officer
Lora Leverage, Vice President Claims
Colleen Marchesani, Director of Human Resources
Scott Campbell, Director of Property Claims Operations
Douglas Collins, Controller Financial Reporting
Michelle Dempsey, AVP Operational Process Management
Thomas Green, Project Manager
Laura Johnson, AVP of Underwriting and Product Development
Crystal McInnis, AVP Sales & marketing
Courtney Siders, Senior Counsel and Manager
Matt Haynes, Treaties and Finance
Travis Rosencrans, Portfolio Manager
Mike Taylor, Managing Director and Head of Fundraising and Investor Relations

K. **"Loss"** means money which an **Insured** is legally obligated to pay as a result of a **Claim** Including, but not limited to:

     1. compensatory punitive, exemplary and multiple damages where insurable by law;

     2. settlements, judgments (including prejudgment and post judgment interest awarded against an **Insured** on that part of any judgment paid by the Underwriters) and statutory attorney fees;

     **3. Defense Costs;**

However, **Loss** (other than **Defense Costs**) shall not include any of the following:

     1. the cost of providing non-monetary relief;
     2. fines or penalties;.
     3. costs incurred as the result of any direction or request that the Insureds test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants.

The insurability of matters otherwise included within this definition shall be determined under the law of the applicable jurisdiction most favorable to such insurability, including, without limitation, the jurisdiction in which the Insured Organization, the Insured Persons, the Insurer or such Claim is located.

The insurer shall not assert that **Loss** resulting from a **Claim** that may be subject to Section III. I 1 and 2 is uninsurable, and shall treat such **Loss** as covered hereunder unless there is a final, non-appealable adjudication of scuh as required in Section III. I 1 and 2.

L. **"Outside Entity"** means:

     1. any non-profit corporation, community chest, fund or foundation that is not included in the definition of the **Insured Organization** and that is exempt from federal income tax; or

2. any other entity, if specified in an endorsement to this Policy.

M. **"Outside Executive Position"** means the position of director, officer, trustee or other equivalent executive position held by any of the **Insured Persons** in an **Outside Entity** if service in such position is at the specific request of the **Insured Organization.**

N. **Securities Claim** means a **Claim** against any Insured:

  1. alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solitication of an offer to purchase or sell securites) which is:

  a. brought by any person or entity alleging, arising out of, based upon or attributable to, in whole or in part, the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Insured Organization**; or

  b. brought by a security holder of an **Insured Organization** with respect to such security holder's interest in securties of such **Insured Organization**; or

  2. which is a **Derivative Suit**

O. **"Wrongful Act"** means:

  1. any actual or alleged breach of duty, error, misstatement, misleading statement, act or omission by:

      a. any of the **Insured Persons** in their capacity as such;
      b. any of the **Insured Persons** while in an **Outside Executive Position** solely with respect to the coverage afforded under Insuring Clause I.E;
      c. the **Insured Organization** solely with respect to the coverage afforded under Insuring Clause I.C.;

  2. any matter claimed against any of the **Insured Persons** solely by reason of their serving in such capacity or in an **Outside Executive Position** solely with respect to the coverage afforded under Insuring Clause I.E.

  3. Solely with respect to determining whether a securities holder derivative lawsuit which names any **Insured Organization** as a defendant (including as a "nominal defendant") in a **Securities Claim** against said **Insured Organization**. For the purpose of Insuring Agreement I.C, any **Wrongful Act** of **Insured Persons** as described in subsection (1) above shall also be deemed to be a **Wrongful Act** of said **Insured Organization**, provided, however, this provision shall not be deemed to create coverage for Costs of Investigations under Insuring Agreement I.C. Any coverage for such costs is only available under Insuring Agreement I. D.

## III. EXCLUSIONS

The Underwriters shall not be liable to make any payment for Loss in connection with that portion of any Claim:

A. for actual or alleged libel, slander, defamation, bodily injury, sickness, disease, death, false arrest, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy, or damage to or destruction of tangible property (including loss of use thereof);

B. based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1. the actual, alleged or threatened discharge, release, escape, seepage, migration, dispersal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or

    2. any direction or request that the **Insureds** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so (such costs hereinafter "Clean Up Costs") including, but not limited to, any **Claim** alleging damage to the **Insured Organization** or its securities holders, purchasers or sellers;

C. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by any law concerning workers' compensation, disability benefits, unemployment compensation law, social security or other employment benefits law, the Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, including any similar federal, state or local law, regulations promulgated thereunder, or any amendments thereto, or any other law based on the same violations; provided, however this exclusion shall not apply to a **Securities Claim.**

D. for actual or alleged violation(s) of the Employee Retirement Income Security Act of 1974 ("ERISA"), or any violation of any federal, state, local or foreign statutory law or common law that governs the same topic or subject and any rules, regulations and amendments thereto or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Insured Person** or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA;

E. By  the **Insured Organization**, except and to the extent such **Claim**:

    1. Is a **Derivative Suit**;

    2. any **Claim** brought while the **Insured Organization** is in bankrupty or insolvency;

    3. any **Claim** brought outside the United States of America.

    Notwithstanding the foregoing, this Exclusion D. shall not apply to **Defense Costs** incurred in connection with any **Claim** under Insuring Clause I.A.;

F. against any of the **Insured Persons** serving in an **Outside Executive Position**:

    1. by, on behalf of, or for the benefit of the **Outside Entity**, or one or more of the **Outside Entity's** directors, officers, trustees or equivalent executives; or

    2. By an **Outside Entity** against an **Insured Person** who is acting in his or her **Outside Executive Position** in such **Outside Entity** at the time such **Claim** is first made,

    However this exclusion shall not apply to the extent such Claim:

    A.  is a **Derivative Suit**;

    B.  any **Claim** brought while the **Outside Entity** is in bankruptcy or insolvency;

    C.  any **Claim** brought outside the United States of America.

Notwithstanding the foregoing, this Exclusion E. shall not apply to **Defense Costs** incurred in connection with any **Claim** under Insuring Clause I.E.;

G. based upon, arising out of, resulting from or in consequence of the public offer, sale, solicitation or distribution of securities of the **Insured Organization** or an **Outside Entity** provided, however, this exclusion will not apply to, i. any offer, purchase or sale of securities of the **Insured Organization**, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction"), ii. any **Wrongful Act** relating to an Insured **Organization's** preparation for any public offering, including any road show presentation to potential investors or other similar presentation, made by the **Insured Organization** and its **Insured Persons** via any medium in connection with such public offering, if such offering does not occur

If at least thirty (30) days prior to an offering of securities of the **Insured Organization**, other than pursuant to an Exempt Transaction, the Underwriters receive notice of the proposed transaction and any additional information requested by the Underwriters, the **Insured Organization** may request a proposal for coverage subject to any additional terms and conditions and payment of any additional premium the Underwriters may specify in such proposal. However, the Underwriters will not be obligated to provide such coverage;

G. based upon, arising out of, resulting from or in consequence of, the purchase by the **Insured Organization** of securities of any entity whose securities are traded on any public stock exchange which purchase results in the **Insured Organization** having the right to vote for the election of such entity's directors, either directly or indirectly;

H. for:

       1. any deliberately fraudulent or deliberately criminal act or omission by any of the **Insureds,** if a final, non-appealable adjudication in the underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Underwriters) establishes such a deliberately fraudulent or deliberately criminal act or omission; or

       2. any personal profit or financial advantage gained by any of the **Insured Persons** to which they were not legally entitled if a final, non-appealable adjudication in the underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Underwriters) establishes the gaining of such profit, or advantage

however, this exclusion shall not apply to **Defense Costs** incurred up until such determination is made;

I. with respect to Insuring Clause C. only:

       1. for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret, trade dress, or any other intellectual property rights;

       2. based upon, arising out of, resulting from or in consequence of any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture

3. for actual or alleged breach of written contract or agreement, warranty, or guarantee where such **Claim** is brought by or on behalf of a party to or beneficiary of such contract, agreement, warranty, or guarantee except to the extent that the **Insured** would have been liable in the absence of such contract, agreement warranty, or guarantee;

4. for the liability of others assumed by the **Insured Organization** under any contract or agreement, oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement;

5. by, on behalf of, or at the direction of any employee of or applicant for employment with the **Insured Organization** including without limitation any leased employee, seasonal employee or volunteer; provided that this exclusion shall not apply to a **Claim** brought  by any such person in his or her capacity as a shareholder of the **Insured Organization**

For the purposes of determining the applicability of these Exclusions, the Wrongful Acts and knowledge of any **Insured** shall not be imputed to any other **Insured Person** Solely with respect to Insuring Agreement C, CEO and CFO of Parent Company imputes to the entity.

## V. ORDER OF PAYMENTS

Underwriters shall pay **Loss** in the following order:

1. first, under Insuring Clause I.A., provided however that such **Loss** is allocable to any **Wrongful Act** committed or any conduct undertaken prior to the **Insured Organization** becoming a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

2. second, under Insuring Clause I.A. where such **Loss** is allocable to any **Wrongful Act** committed or any conduct undertaken on or after the **Insured Organization** became a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

3. third, at the written request of the chief executive officer of the **Named Insured**, Underwriters shall either pay or withhold **Loss** payable under Insuring Clause I.B.; and

4. lastly, at the written request of the chief executive officer of the **Named Insured**, Underwriters shall either pay or withhold **Loss** payable under Insuring Clauses I.C. and I.D.

In the event Underwriters withhold payment pursuant to sub-paragraphs 3. and 4. above, then Underwriters shall, at such time and in such manner as shall be set forth in the instructions of the chief executive officer of the **Named Insured**, remit such payment to the **Insured Organization** or directly to or on behalf of the **Insured Persons**.

Underwriters shall have no obligation to pay **Loss** after exhaustion of the Limit of Liability or Sublimit of Liability, if applicable, regardless of whether the **Insured Organization** has withheld payment.

All other terms and conditions of this Policy remain unchanged.

## VI. ADDITIONAL SIDE A D&O LIMIT

If purchased as indicated in Item 4. of the Declarations, the applicable amount shown in Item 4. shall be the Additional Side A D&O Limit of Underwriters applicable only to **Claims** under Insuring Clause I.A. above, which Limit shall be separate and in addition to any other limit shown in Item 4. of the Declarations. The Additional Side A D&O Limit shall apply excess of the aggregate limit of liability applicable to the Private Organization Directors, Officers and Entity Liability Clause and all policies of insurance providing excess coverage.

## FIDUCIARY LIABILITY CLAUSE

### I. INSURING CLAUSES

A. The Underwriters shall pay on behalf of the **Insureds** all **Loss** resulting from any **Claim** first made against any **Insured** and reported in writing to the Underwriters during the **Policy Period** or **Optional Extension Period**, if applicable, for a **Wrongful Act**.

B. The Underwriters shall pay on behalf of the **Insureds** in an amount not to exceed $100,000 any **Voluntary Compliance Fees** and **Defense Costs** incurred with respect to a **Voluntary Compliance Notice**, and if coverage is sought by the Insured, reported to the Insurer as required by this Insuring Clause. Such amount shall be subject to the Retention set forth in Item 5. of the

Declarations and shall be part of and not in addition to the Limit of Liability set forth in Item 4. of the Declarations. This Insuring Clause shall not apply to any **Voluntary Compliance Fees** and **Defense Costs** incurred with respect to any **Insured's** participation in any **Voluntary Compliance Program** initiated prior to the Inception Date of this Policy.

C. This policy shall pay the **Loss** of an **Insured** arising from a **Claim** made against such **Insured** alleging improper or negligent selection of a **Managed Care Services** provider or denial or delay of any benefit under a health care, pharmaceutical, vision, or dental **Plan** of an **Insured**.

### II. DEFINITIONS

The following terms whenever used in this Clause in boldface type shall have the meanings indicated. Terms not defined below, but appearing in boldface type shall have the meanings indicated in the Policy Terms and Conditions.

A. **"Administration"** means one or more of the following administrative duties or activities with respect to a **Plan**:

> 1. counselling or advising participants or beneficiaries;
>
> 2. providing interpretations;
>
> 3. handling of records;
>
> 4. affecting enrolment, notification, termination, amendment or cancellation of participants or
> Beneficiaries; or
>
> 5. Preparing, distributing or filing required notices or documents; or activities affecting enrollment, termination, or cancellation of employees, participants, and beneficiaries.

B. **"Administrator"** means a natural person with responsibility for **Administration** and any third party which is included in the definition of **Administrator** by written endorsement attached hereto, but only with respect to a **Plan**.

D. **"Benefits"** means any obligation under a **Plan** to a participant or beneficiary of a **Plan**.

E. **"Claim"** means:

    1. a written demand for monetary damages, non-monetary, or injunctive relief against any of the **Insureds**, to toll or waive a statute of limitations or to engage in an arbitration, mediation or other alternative dispute resolution proceeding which shall be deemed first made upon receipt by the **Insured** of such demand;;

    2. a civil, criminal, arbitration, administrative, investigative or regulatory proceeding initiated against any of the **Insureds** commenced by:

        a. the service of a complaint or similar pleading upon an **Insured**;

        b. the receipt by an **Insured** of a filing of a notice of charge, investigative order or similar document; or

        c. the receipt by an **Insured** of a written notice or subpoena from an investigatory authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced;

    3. any fact-finding investigation by the Department of Labor, the Pension Benefit Guaranty Corporation or similar governmental agency located outside the United States;

    4. solely with respect to Insuring Clause I.B., a **Voluntary Compliance Notice**; provided, however, that a Voluntary Compliance/Correction Program only shall constitute a Claim under this Coverage Part if the Insured Person or Insured Entity elects to give to the Insurer written notice thereof, at which point such Voluntary Compliance/Correction Program shall be deemed first made; or

    5. solely with respect to Insuring Clause 1.D., an Internal Appeal, provided, however, that an Internal Appeal only shall constitute a Claim under this Coverage Part if the Insured Person or Insured Entity elects to give to the Insurer written notice thereof, at which point such Internal Appeal shall be deemed first made.

F. **Covered Penalties** solely in connection with a **Plan**:
(1) the 5% or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**;
(2) the 20% or less civil penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to a covered settlement or judgment;

(3) the civil fines and penalties assessed against an **Insured** by either the United Kingdom's Pensions Ombudsman or the Pensions Regulator or any successor body thereto;

(4) **Voluntary Compliance Fees** subject to the aggregate sublimit of liability set forth in the Declarations;

(5) the civil penalties under Section 502(c) of **ERISA**, other than penalties under the Pension Protection Act, subject to the aggregate sublimit of liability set forth in the Declarations (" **Section 502(c) Penalties**");

(6) the civil penalties under the Pension Protection Act of 2006, subject to the aggregate sublimit of liability set forth in the Declarations ("**Pension Protection Act Penalties**");

(7) **HIPAA Penalties**, subject to the aggregate sublimit of liability set forth in the Declarations;

(8) the civil penalties imposed under rules and regulations (including interim final rules and regulations) provided by governmental agencies (including the U.S. Department of Health and Human Services, the U.S. Department of the Treasury, the U.S. Internal Revenue Service ("IRS"), and the DOL, the Office of Consumer Information and Insurance Oversight, and the Employee Benefits Security Administration), for inadvertent violations by an **Insured** of **Health Care Reform Law**, subject to the aggregate sublimit of liability set forth in the Declarations (" **Health Care Reform Penalties**"); and

(9) the 15% or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments, subject to the aggregate sublimit of liability set forth in the Declarations (" **Section 4975 Penalties**").

G.**"Defense Costs"** means reasonable fees and expenses which are incurred by or on behalf of the **Insureds** in
defending, settling, appealing or investigating any **Claim** and the cost of appeal, supersedeas, injunction, attachment or similar bonds (provided, however, the Underwriters shall have no obligation to apply for or furnish any bond for appeal, supersedeas, injunction, attachment or any similar purpose**). Defense Costs** shall not include salaries, regular or overtime wages, fees or benefit
expenses associated with **Insured Persons** or the **Insured Organization's** overhead expenses.

H. **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, including, but not limited to amendments pursuant to:
(1) COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1985);
(2) HIPAA;
(3) the Newborns' and Mothers' Health Protection Act of 1996;
(4) the Mental Health Parity Act of 1996;
(5) the Women's Health and Cancer Rights Act of 1998;
(6) the Pension Protection Act of 2006; and
(7) **Health Care Reform Law**;
and including any amendments thereto and regulations thereunder.
I. **"ESOP"** means any employee stock ownership plan as defined in **ERISA** or any **Plan** under which investments are made primarily in securities of the **Insured Organization.**

J. "**ESOP Administration**" means one of more of the following administrative duties or activities with respect to an **ESOP**:

    1. giving notice to employees, participants or beneficiaries;

    2. interpreting benefits;

    3. handling records; or

    4. effecting enrolment, termination or cancellation of employees, participants, or beneficiaries

Provided, however, that **ESOP Administration** does not include the giving of advice or counsel with respect to any matter relating to securities issued by the **Insured Organization**.

K. **"Executive Officer"** means any duly elected officer, director, natural person partner, principal,
**Manager**, in-house general counsel or member of the **Insured Organization's** legal department, trustee or **Administrator** or individual acting in a similar capacity with the **Insured Organization**.

L. **"Fiduciary"** means a fiduciary of a **Plan** as defined in **ERISA**.

M. "**Health Care Reform Law**" means the Patient Protection and Affordable Care Act ("PPACA") and the Health Care and Education Reconciliation Act of 2010.

N. **HIPAA Penalties**" means civil money penalties imposed upon an **Insured** for violation of **HIPAA Privacy Regulations**.

O. **HIPAA Privacy Regulations**" means the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 and any amendments thereto.

P. **"Insured"** means any **Insured Person**, the **Insured Organization** and any **Plan**.

Q. **"Insured Person"** means all persons who were, now are, or shall be employees of the **Insured Organization** or a **Plan**; or duly elected or appointed directors, officers, trustees or **Managers** of the **Insured Organization** or a **Plan** in his or her capacity as a **Fiduciary** or **Administrator** of a **Plan** including all persons outside the United States of America serving in a functionally equivalent role including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy. Also means, solely with respect to a **Plan**, any past, present, or future **Executive** or employee of an **Insured Organization** in his or her settlor capacity as respects a **Plan.**

R. **"Loss"** means money which an **Insured** is legally obligated to pay as a result of a **Claim**, other than a **Voluntary Compliance Notice**, including compensatory, punitive, exemplary and multiple, damages, judgments (including prejudgment or post judgment interest awarded against an **Insured** on that part of any judgment paid by the Underwriters), settlements, statutory attorney's fees, and **Defense Costs.** However, **Loss** shall not include:

1. taxes or the loss of tax benefits, or civil or criminal fines or penalties imposed by law except for **Covered Penalties;**

2. **Benefits**, which are or may become due except to the extent that such sums are payable as a personal obligation of a natural person **Insured** because of such natural person **Insured's Wrongful Act**;

3. any amounts for which the **Insureds** are legally or financially absolved from payment; or

4. matters deemed uninsurable under the law pursuant to which this Policy shall be construed.

The insurability of matters otherwise included within this definition shall be determined under the law of the applicable jurisdiction most favorable to such insurability, including, without limitation, the jurisdiction in which the Insured Organization, the Insured Persons, the Insurer or such Claim is located.

S. **"Managed Care Services"** means the administration or management of a health care, pharmaceutical, vision or dental **Plan** utilizing cost control mechanisms, including, but not limited to utilization review, case management, disease management, pharmacy management, the use of a preferred provider medical, vision or dental network, or a health maintenance organization.

T. **Plan"** means any plan, fund or program, regardless of whether it is subject to regulation under Title I of **ERISA** or any part thereof, or meets the requirements for qualification under Section 401 of the Internal Revenue Code of 1986, as amended, and which is:

1. a welfare plan as defined in **ERISA** sponsored solely by the **Insured Organization** or sponsored jointly by the **Insured Organization** and a labor organization, solely for the benefit of the employees of the **Insured Organization**, and which is so sponsored prior to the inception date of this Policy or becomes so sponsored after the inception date of this Policy pursuant to Clause IV.A.;

2. a pension plan as defined in **ERISA** (subject to 7. below) sponsored solely by the **Insured Organization** or sponsored jointly by the **Insured Organization** and a labor organization, solely for the benefit of the employees of the **Insured Organization**, and which is so sponsored prior to the inception date of this Policy or becomes so sponsored after the inception date of this Policy pursuant to Clause IV.A.;

3. a plan which is both a welfare plan and a pension plan as defined in **ERISA** (subject to 7. below) sponsored solely by the **Insured Organization** or sponsored jointly by the **Insured Organization** and a labor organization solely for the benefit of the employees of the **Insured Organization**, and which is so sponsored prior to the inception date of this Policy or becomes so sponsored after the inception date of this Policy pursuant to Clause IV.A.;

4. a government-mandated program for unemployment insurance, workers compensation, social security or disability benefits for employees of the **Insured Organization**;

5. any other plan, fund or program which is included in the definition of **Plan** by written endorsement attached hereto;

6. any other employee benefit plan that is not subject to Title I of **ERISA**, including any fringe benefit or excess benefit plan, that was, is, or becomes sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**; or

7. an **ESOP** but solely with respect to **ESOP Administration**. No **ESOP** is included within the definition of **Plan** with respect to **Claims** for any **Wrongful Act** other than **ESOP Administration** unless that **ESOP** is specifically included within the definition of **Plan** by written endorsement attached hereto.

U. **"Voluntary Compliance Fees"** means any costs of corrections, fees, penalties or sanctions imposed by law under a **Voluntary Compliance Program** that any **Insured** becomes legally obligated to pay as a result of **Wrongful Acts**, but shall not include any other costs, charges, expenses, fees, penalties, sanctions, assessments, damages, taxes or matters that may be deemed to be uninsurable under the law pursuant to which this Policy shall be construed.

V. **"Voluntary Compliance Notice"** means a written notice given to the Underwriters indicating an **Insured's** intent to participate in a **Voluntary Compliance Program** during the **Policy Period**.

W. **"Voluntary Compliance Program"** means any voluntary compliance resolution program or similar voluntary settlement program administered by the Internal Revenue Service or Department of Labor of the United States, including, but not limited to, the Employee Plans Compliance Resolution System, the Self Correction Program, the Audit Closing Agreement Plan, the Delinquent Filer Voluntary Compliance program and the Voluntary Fiduciary Correction program.

X. **"Wrongful Act"** means:

    1. as respects a **Fiduciary**, a **Plan** or the **Insured Organization**:

        a. any actual or alleged violation of any of the responsibilities, obligations or duties imposed on **Fiduciaries** by **ERISA** in connection with a **Plan**; or

        b. any matter claimed against an **Insured** by reason of his, her or its status as a **Fiduciary** of a **Plan**;

    2. as respects an **Administrator**:

        a. any actual or alleged act, error or omission in the performance of **Administration**; or

        b. any matter claimed against an **Administrator** by reason of his or her status as such;

    3. as respects an **Insured Person**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any other plan, including a multiemployer plan, but only if such service is at the specific request of the **Insured Organization**; or

    4. any actual or alleged act, error or omission by an **Insured Person** in the performance of **ESOP Administration**.

    5. any actual or alleged act, error, or omission by an Insured in a settlor capacity as respects a **Plan.**

## III. EXCLUSIONS

The Underwriters shall not be liable to make any payment for **Loss** or **Voluntary Compliance Fees** in connection with that portion of any Claim:

A. for actual or alleged libel, slander, defamation, bodily injury, sickness, disease, death, false arrest, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy, or damage to or destruction of any tangible property (including loss of use thereof); provided, however, this exclusion shall not apply to: (a) **Defense Costs** incurred in the defense of a **Claim** for a violation of **ERISA** by an **Insured.**

B. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

    1. the actual, alleged or threatened discharge, release, escape, seepage, migration, dispersal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere, or

    2. any direction or request that the **Insureds** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so, including, but not limited to, any **Claim** alleging damage to the **Insured Organization** or the **Plan** or any of their security holders, purchasers or sellers provided, however, that this exclusion shall not apply to any **Claim** by or on behalf of a beneficiary of or a

participant in any **Plan** relating to the diminution in value of any securities issued by an organization other than the **Insured Organization** which are owned by the **Plan**;

C. based upon, arising out of, resulting from, or in consequence of discrimination in violation of any law other than **ERISA** or any similar act;

D. for liability of others assumed by the **Insured** under any contract or agreement, either oral or written, except to the extent that the **Insured** would have been liable in the absence of the contract or agreement or unless the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Plan** was established;

E. based upon, arising out of, resulting from, or in consequence of any **Wrongful Act** as respects a **Plan** taking place at any time when the **Insured Organization** did not sponsor such **Plan**;

F. for any actual or alleged violation of responsibilities, duties or obligations imposed on an **Insured** under any law concerning workers' compensation, unemployment insurance, Social Security, or disability insurance, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the Occupational Safety and Health Act, the National Labour Relations Act, including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law other than COBRA;

G for:

    1. any deliberately, fraudulent or deliberately criminal act, or omission by any of the **Insureds**; if a final, non-appealable adjudication in the underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Underwriters) establishes such a deliberately fraudulent or deliberately criminal act or omission; or

    2. any personal profit or financial advantage gained by any of the **Insured Persons** to which they were not legally entitled if a final, non-appealable adjudication in the underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Underwriters) establishes the gaining of such profit or advantage.

provided, however, this exclusion shall not apply to **Defense Costs** incurred up until such determination is made.


## IV. ACQUISITIONS

### A. **Sponsorship of Another Plan**

In the event the **Insured Organization** becomes a sponsor of a plan, other than an **ESOP**, after the inception date of this Policy, whether by acquisition of a **Subsidiary** or another entity, merger with another entity where the **Insured Organization** is the surviving entity or by its own creation, and the total assets of such newly sponsored plan do not exceed twenty-five percent (25%) of the total consolidated assets of the existing **Plans** as set forth in the most recent audited financial statements, coverage shall be afforded for such **Subsidiary** or entity, such **Subsidiary's** or entity's **Plan** and its **Insured Persons** until the end of the **Policy Period**, but only with respect to **Wrongful Acts** committed or allegedly committed after the effective date of such sponsorship by the **Insured Organization**. Coverage for such **Subsidiary** or entity, such **Subsidiary's** or entity's **Plan** and its **Insured Persons** for such **Plans** whose total assets do exceed twenty-five percent (25%) of the total consolidated assets of the existing **Plans** as set forth in the most recent audited financial statements shall be afforded for a period of ninety (90) days, but only with respect to **Wrongful Acts** committed or allegedly committed after the effective date of such

sponsorship by the **Insured Organization**. Coverage beyond such ninety (90) days shall only be available if:

1. written notice of such sponsorship is given to the Underwriters by the **Insured Organization**;

2. the **Insured Organization** provides the Underwriters with such information in connection therewith as the Underwriters may deem necessary;

3. the **Insureds** accept any special terms, conditions, exclusions or additional premium as may be required by the Underwriters; and

4. the Underwriters, at its sole discretion, agrees to provide such coverage.

Notwithstanding the foregoing, with respect to an **ESOP**, coverage shall be granted pursuant to this Clause only for **Claims** relating to **ESOP Administration** and no coverage shall be granted for **Claims** alleging any other **Wrongful Acts** unless such **ESOP** is included in the definition of **Plan** by a written endorsement to this Policy and any related additional premium required by the Underwriters has been paid.

B. **Cessation of Plan Sponsorship and Termination, Sale or Spin-off of Plan**

In the event a **Plan** ceases to be sponsored by the **Insured Organization** or ceases to be sponsored jointly by the **Insured Organization** and a labour organization after the Inception Date of this Policy, or in the event the **Insured Organization** terminates, sells or spins off any **Plan** before or after the inception date of this Policy; or of any policy issued by the Underwriters of which this Policy is a renewal or replacement, coverage under this Policy with respect to such **Plan** and its **Insured Persons** shall continue until the end of the **Policy Period** for those who were **Insureds** at the time such **Plan** ceased to be sponsored by the **Insured Organization,** or jointly by the **Insured Organization** and a labour organization, or who were **Insureds** at the time of such **Plan** termination, sale or spin-off or who would have been **Insureds** at the time of **Plan** termination, sale or spin-off if this Policy had been in effect, but only with respect to **Wrongful Acts** committed or allegedly committed prior to the date such **Plan** ceased to be sponsored by the **Insured Organization,** or jointly by the **Insured Organization** and a labour organization, or such **Plan** termination, sale or spin-off. The **Insureds** shall give notice to the Underwriters of cessation of sponsorship as soon as practicable together with such information as the Underwriters may require.

C. **Merged Plans**

In the event a **Plan** is merged with another **Plan** during the **Policy Period**, this Policy shall continue to provide coverage for both **Plans** for as long as this Policy shall remain in effect and subject to all the terms and conditions of this Policy.

In the event a **Plan** is merged with another plan for which coverage is not provided under this Policy, this Policy shall continue to provide coverage only for the covered **Plan** for as long as this Policy shall remain in effect and subject to all the terms and conditions of this Policy for **Claims** with regard to **Wrongful Acts** which took place prior to the date the plans merged.

**Endorsements**

Tie-in of Limits Endorsement

It is hereby understood and agreed that the amount set forth in Item 4 of the Policy Declarations shall be the maximum aggregate Limit of Liability of the **Insurer** under the **Combined Policies** for all **Claims** arising from any **Wrongful Act.**

Any payment by the **Insurer** under the **Combined Policies** shall reduce the Limit of Liability accordingly by the paid amount.

With respect to this endorsement, **Combined Policies** shall mean:

- Section Two of this Policy (Policy Number: B0901LI1837279) issued to Gemini Financial Holdings, LLC.; and
- Insuring Agreements A and B of Policy Number: B0901LI1837278 issued to Gemini Re, LLC.
- 

All other terms, conditions and limitations remain unchanged.

**EXHIBIT B**

# RLI®    IMPORTANT NOTICE TO POLICYHOLDERS

## TERRORISM RISK INSURANCE ACT, AS AMENDED

Under the Terrorism Risk Insurance Act, as amended (the **"Act"**), we must make coverage for **"certified acts of terrorism"** available in the policies we offer. We notified you at the time of offer and purchase of the policy to which this Notice is attached that this coverage would be a part of your policy. The premium allocated for such coverage is shown on the Declarations page of the policy.

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States government under a formula established by federal law. Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

You should also know that the Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Specific coverage terms for terrorism, including limitations and exclusions, are more fully described in endorsements attached to the policy. Your policy may contain an exclusion for losses that are not eligible for federal reinsurance under the Act.

Definitions:

**"Certified act of terrorism,"** as defined in Section 102(1) of the Act, means an act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Insured

# Executive Plus™
# Directors and Officers
# Liability Policy
# Declarations
# Florida



RLI Insurance Company
9025 North Lindbergh Drive
Peoria, Illinois 61615
Phone: (309) 692-1000

A stock insurance company,
herein called the Company.

**THIS IS A CLAIMS MADE POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED PERSONS DURING THE POLICY PERIOD OR DISCOVERY PERIOD (IF PURCHASED). PLEASE READ IT CAREFULLY.**

Policy No: EPG0027008

Item 1. **Parent Company**:

Gemini Financial Holdings, LLC
4200 Northcorp Pkwy
Suite 400
Palm Beach Gardens, FL 33410

Item 2. **Policy Period**:   From   12/25/2018        12:01 A.M.
                             To     12/25/2019        12:01 A.M.
                             Local Time at the address shown above.

Item 3. Aggregate Limit of Liability (inclusive of **Defense Expenses**) for all **Claims**:        $10,000,000 XS of $20,000,000

Premium:                                                                                             $ 35,000

Florida HCF & FIGA Surcharge: $              (included in above premium)

Item 4. Coverage:                     Granted:

Primary Coverage          ☐ Yes  ☒ No
Excess Coverage           ☒ Yes  ☐ No

Item 5. **Underlying Insurance**:

| Insurer | Policy Number | Limit of Liability | Policy Period |
|---|---|---|---|
| Lloyd's Syndicate AUL 1274 | B0901LI1837279 | $10,000,000 | 12/25/2018 to 12/25/2019 |
| Indian Harbor Insurance Company | ELU159489-18 | $10,000,000 XS of $10,000,000 | 12/25/2018 to 12/25/2019 |

Item 6.  Discovery Period:

    (a)  Discovery Period Premium:           $ 52,500

    (b)  Discovery Period:                   1 year

Item 7.  Prior or Pending Date:               09/14/2015

Item 8.  Endorsements Effective at Inception:

EPDO 409 (02/11), EPDO 631 (02/11), EPDO 632 (03/11), EPG 900FL (05/15), ILF 0001C FL (04/16), MNU-EPDO 005 (10/13), MNU-EPDO 031 (10/13), MNU-EPDO 042 (10/13), MNU-EPDO 044 (10/13), RIL 110A (01/08), RIL 200 (10/00), RIL 2133C FL (05/15), UW 1009 (08/95), UW 20342 (03/12), UW 21009 (10/06), MNU-EPDO-146 (01/19), MNU-EPDO-154 (01/19), MNU-EPDO-164 (01/19), MNU-EPDO-167 (01/19), MNU-EPDO-171 (01/19), MNU-EPDO-174 (02/19), MNU-EPDO-175 (02/19), MNU-EPDO-176 (02/19), MNU-EPDO-101 (02/19)

Date:  01/23/2019

Authorized Company Representative

_____

Countersignature

EPDO 100FL (02/12)

Insured

**RLI Insurance Company**
9025 North Lindbergh Drive, Peoria, IL 61615

## SUPPLEMENTAL DECLARATIONS

Policy No:  EPG0027008

Named Insured and Mailing Address

Gemini Financial Holdings, LLC
4200 Northcorp Pkwy
Suite 400
Palm Beach Gardens, FL 33410

Portion of premium attributable to coverage for Certified Acts of Terrorism     $0

RIL 110A (01/08)

Insured

Policy Number: EPG0027008

**RLI Insurance Company**

# Executive Plus™ Directors and Officers
# Liability Policy

**In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the Application forming a part hereof and its attachments and the material incorporated therein, RLI Insurance Company, herein called the "Insurer," and the Insured Persons agree as follows:**

## INSURING CLAUSES

1.  The Insurer will pay on behalf of the **Insured Persons**, **Loss** (including civil penalties assessed under Section 308 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. Section 7246) which the **Insured Persons** are legally obligated to pay as a result of **Claims** first made during the **Policy Period**, or during the Discovery Period (if purchased), against the **Insured Persons** for **Wrongful Acts**; provided that if this Policy affords Excess Coverage as provided in Item 4. of the Declarations of this Policy, the Insurer shall not be liable for any **Loss** unless such **Loss** is not paid by the **Underlying Insurance** by reason of one or more of the following:

    a.  the insurer(s) of the **Underlying Insurance**:

        (i)   refuses to pay or indemnify the **Insured Persons** as required under the terms and conditions of the **Underlying Insurance**; or

        (ii)  is financially unable to pay or indemnify the **Insured Persons**; or

        (iii) rescinds or attempts to rescind the **Underlying Insurance**; or

        (iv)  fails to pay or indemnify the **Insured Persons** within sixty (60) days after a written request by or on behalf of the **Insured Persons** for such payment or indemnification; or

    b.  according to the terms and conditions of the **Underlying Insurance**, the insurer(s) of the **Underlying Insurance** is not liable for such **Loss**; or

    c.  the limit(s) of liability or any applicable sublimit(s) of liability of the **Underlying Insurance** has been exhausted by reason of losses paid thereunder by the insurer(s) of the **Underlying Insurance**; or

    d.  a liquidation or reorganization proceeding is commenced by or against the **Entity** pursuant to the **Bankruptcy Code** and as a result of such proceeding the insurer(s) of the **Underlying Insurance** refuse to pay or indemnify such **Loss** because the proceeds of the **Underlying Insurance** are subject to the automatic stay or similar payment prohibition under the **Bankruptcy Code**; provided that as a condition precedent to the Insurer being liable pursuant to this paragraph d., the **Insured Persons** or the **Entity** shall request, or arrange for the insurer of the **Underlying Insurance** to request, relief from the automatic stay or such similar payment prohibition with respect to such proceeds.

2.  In the event any **Underlying Insurance** affords broader coverage for an **Insured Person** than is afforded under this Policy, then, notwithstanding anything in this Policy to the contrary except:

    Exclusion 4. b.; Section 5., Limit of Liability; Section 6., Defense and Settlement; Section 7., Notice/Claim Reporting Provisions; Section 9., Cancellation; Section 12., Acquisitions, Mergers and Subsidiaries; Section 17., Representations; Severability; Section 18., Subrogation; Indemnification; Section 19., Other Insurance; Section 21., Valuation and Foreign Currency; Section 22., Authorization; Section 23. Action Against the Insurer; Section 24., Assignment; and Section 25., Changes; and any endorsement to this Policy;

this Policy is amended to follow and be subject to the terms and conditions of such **Underlying Insurance** only in respect of and to the extent of such broader coverage for the **Insured Persons**, provided the Insurer shall not cover the **Entity** with respect to any claims made against the **Entity** or for any amounts the **Entity** pays to indemnify, or pays on behalf of, the **Insured Persons**.

If and to the extent any **Loss** is excluded under this Policy pursuant to Section 4. a. or c. but is not excluded under the **Underlying Insurance**, this Policy is amended to delete such exclusion with respect to such **Loss**.

## DEFINITIONS

3.   When used in this Policy:

"**Bankruptcy Code**" means the U.S. Bankruptcy Code, as amended, or any similar federal, state, foreign or common law.

"**Claim**" means:

a.   a written demand for monetary or non-monetary relief against any **Insured Person**; or

b.   a civil proceeding against any **Insured Person** commenced by the service of a complaint or similar pleading; or

c.   a criminal proceeding against any **Insured Person** commenced by the return of an indictment; or

d.   an administrative, regulatory or arbitration proceeding against any **Insured Person** commenced by the filing of a notice of charges or formal investigative order; or

e.   a civil, criminal, administrative or regulatory investigation against any **Insured Person** commenced by the service upon or other receipt by the **Insured Person** of a subpoena, target letter or written notice, including without limitation an SEC Wells Notice, from the investigating authority identifying such **Insured Person** as an individual against whom a proceeding may be commenced; or

f.   an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** in connection with **Extradition** of such **Insured Person**; or

g.   a written notice to the Insurer of circumstances or **Wrongful Acts** which may reasonably give rise to a **Claim**, as described in Section 7. of this Policy; or

h.   any request or demand by a regulatory, administrative, governmental or similar authority to interview or depose an **Insured Person** or for the production of documents by an **Insured Person**, in his or her capacity as such, whether or not such **Insured Person** is alleged to have committed a **Wrongful Act**, or for an **Insured Person** to provide information in connection with any investigation of another **Insured Person** or **Entity**; provided such request or demand (i) is not part of a routine or regularly scheduled audit, inspection or general oversight or compliance activity, and (ii) shall constitute a **Claim** under this Policy only if the **Insured Person** or the **Entity** elects in their sole discretion to give to the Insurer written notice thereof pursuant to Section 7. of this Policy; or

i.   any written demand that the **Insured Person** toll or waive a statute of limitations with respect to a potential or threatened claim against the **Insured Person** for a **Wrongful Act**,

including any appeal thereof.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, regardless of whether such date is before or during the **Policy Period**.

"**Defense Expenses**" means reasonable and necessary fees and expenses (including without limitation attorneys' fees and experts' fees) incurred in the defense, investigation or appeal of a **Claim**, or the opposition or revocation of an **Extradition** or any judicial ruling related thereto, after notice of such **Claim** is given to the Insurer pursuant to Section 7. of this Policy, including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond. **Defense Expenses** shall not include the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, officers or employees.

"**Entity**" means the **Parent Company** and all **Subsidiaries**, including any such organization as a debtor in possession under the United States bankruptcy law or an equivalent status under the law of any other country.

"**Extradition**" means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country in connection with a criminal accusation against such **Insured Person** for **Wrongful Acts**.

"**Independent Directors**" means one or more past, present or future directors of the **Entity** who are not and have never been an officer or employee of any **Entity**.

"**Insured Person**" either in the singular or plural, means:

a. any natural person who was, now is or shall be a duly elected or appointed director, trustee, manager or member of the board of managers (if the **Entity** is a limited liability company), officer, comptroller, in-house general counsel, in-house risk manager, director of investor relations or director of human resources of any **Entity**;

b. any natural person who was, now is or shall be a holder of a title, position or capacity comparable or equivalent to a position described in a. above of any **Entity**;

c. any natural person not identified in a. or b. above who was, now is or shall be an employee of the **Entity**, but solely with respect to a **Claim** while the **Claim** is also made against a person identified in a. or b. above; or

d. any natural person identified in a. or b. above who, at the specific request of the **Entity**, is serving as a director, officer, trustee, regent or governor of any **Outside Entity**.

Any **Claim** against the estate, heir, or legal representative of any person identified in a., b., or c., above, or against a trust which holds assets contributed by such person identified above, for a **Wrongful Act** by such person identified above will be deemed to be a **Claim** against such person identified above; provided, however, this extension shall not afford coverage for wrongful acts of the estate, heir or legal representative. All terms, conditions and other provisions of this Policy which would be applicable to **Loss** incurred by the person identified in a., b., or c., above, in such **Claim** shall also apply to loss incurred by the spouse or domestic partner in such **Claim**.

"**Loss**" means monetary damages, judgments, settlements, including but not limited to pre-judgment and post-judgment interest, punitive, exemplary or multiple damages where insurable under applicable law, and **Defense Expenses** which the **Insured Persons** are legally obligated to pay as a result of a covered **Claim**.

The law of the jurisdiction most favorable to the insurability of punitive, exemplary or multiple damages or taxes, fines or penalties shall control with respect to the insurability of such matters under this Policy, provided that such jurisdiction is where:

a. those damages, taxes, fines or penalties were awarded or imposed;

b. any **Wrongful Act** occurred for which such damages, taxes, fines or penalties were awarded or imposed;

c. the **Entity** is incorporated or has its principal place of business; or

d. the Insurer is incorporated or has its principal place of business.

**Loss** shall not include:

(i) taxes, other than taxes imposed upon an **Entity** for which the **Insured Persons** are legally liable solely by reason of the **Entity's** insolvency;

(ii) fines or penalties imposed by law, other than civil penalties assessed against an **Insured Person** under Section 308 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. Section 7246 or under Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2(g)(2)(B) or for a non-intentional violation of any other federal, state, local or foreign law;

Insured

(iii) any amount for which the **Insured Persons** are absolved from payment; or

(iv) matters which are uninsurable under the law pursuant to which this Policy shall be construed.

Solely with respect to a **Claim** arising out of a public offering of securities of the **Entity**, the Insurer shall not assert that part or all of the **Defense Expenses** are uninsurable, or any other **Loss** as a result of such **Claim** is uninsurable, due to the actual or alleged violation of Section 11 or 12 or 15 of the Securities Act of 1933, as amended.

The foregoing exclusions (i) through (iv) shall not apply to **Defense Expenses**.

"**Outside Entity**" means any organization other than the **Entity**.

"**Outside Position**" means service by any **Insured Person** as a director, officer, trustee, regent or governor of an **Outside Entity**, but only while such service is rendered at the specific request of the **Entity**.

"**Parent Company**" means the organization named in Item 1. of the Declarations of this Policy.

"**Policy Period**" means the period of time specified in Item 2. of the Declarations of this Policy, subject to prior cancellation. If this period is less than or greater than one year, then the Limit of Liability specified in Item 3. of the Declarations of this Policy shall be the Insurer's maximum liability for the entire period.

"**Related Claims**" means all **Claims** for **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

"**Subsidiary**," either in the singular or plural, means:

a.  any for-profit organization for which the **Entity**, on or before the inception of the **Policy Period**, either directly or indirectly has the right, pursuant to written contract or the by-laws, charter, operating agreement or similar document of such organization or otherwise, to control the management or operations of such organization or to elect, appoint or designate a majority of: the Board of Directors if such organization is a corporation; the management committee if such organization is a joint venture or partnership; or the managers or members of the management board if such organization is a limited liability company; or any comparable or equivalent executive if such organization is chartered in any jurisdiction outside the United States of America; and

b.  any not-for-profit organization sponsored exclusively by the **Entity**.

Coverage afforded under this Policy with respect to **Claims** made against any **Insured Person** of a **Subsidiary** shall only apply for **Wrongful Acts** occurring after the effective time such **Subsidiary** became a **Subsidiary** and prior to the time such **Subsidiary** ceased to be a **Subsidiary**.

"**Underlying Insurance**" means the insurance listed in Item 5. of the Declarations of this Policy.

"**Wrongful Act**" means any actual or alleged error, omission, act, misstatement, misleading statement, or breach of duty by the **Insured Persons** in their respective capacities as such or in an **Outside Position**, or, with respect to **Insured Persons** of an **Entity** that is not a partnership, any matter claimed against them solely by reason of such status.

## EXCLUSIONS

4.  The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured Person**:

a.  based upon, arising out of or attributable to such **Insured Person**:

(i) gaining any profit, remuneration or financial advantage to which such **Insured Person** is not legally entitled if a final and non-appealable adjudication adverse to such **Insured Person** in such **Claim** establishes that such **Insured Person** gained such profit, remuneration or financial advantage, or such **Insured Person** agrees to repay or disgorge such profit, remuneration or financial advantage; or

(ii) committing any deliberately fraudulent or deliberately criminal **Wrongful Act** or any willful violation of criminal law if a final and non-appealable adjudication adverse to such **Insured Person** in such **Claim** establishes that such **Insured Person** committed such a **Wrongful Act** or willful violation.

However, this Exclusion shall not apply to:

(a) **Defense Expenses**;

(b) **Independent Directors**; or

(c) any employment-related **Claim**.

b. for which the **Entity** or an **Outside Entity** actually pays or indemnifies or is required or permitted to pay on behalf of or to indemnify the **Insured Person** pursuant to statutory or common law; provided, however, this Exclusion shall not apply if:

(i) the **Entity** and the **Outside Entity** refuse, or fail within sixty (60) days after the **Insured Person's** request, to pay or indemnify or advance such **Defense Costs** or such other **Loss** as required or permitted by law, or are financially unable to pay or indemnify or advance such **Defense Costs** or such other **Loss**; and

(ii) the **Insured Persons** comply with Section 18. of this Policy;

c. based upon, arising out of or attributable to:

(i) the service by any **Insured Person** as a director, officer, partner, principal, trustee, regent, governor or employee of any organization other than the **Entity** unless such service is in an **Outside Position**;

(ii) any litigation or administrative or regulatory proceeding against any **Insured Person** pending on or before the date set forth in Item 7. of the Declarations of this Policy, or any actual or alleged fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged therein; or

(iii) any fact, circumstance, situation, transaction, event or **Wrongful Act** which was the subject of any notice given under any prior policy or coverage section for directors and officers liability or other similar executive liability insurance; provided the insurer of such prior policy does not reject such notice as invalid.

To determine the applicability of the foregoing Exclusions, no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person**.

## CONDITIONS

5. **Limit of Liability**

The amount stated in Item 3. of the Declarations of this Policy is the maximum aggregate liability of the Insurer under this Policy for all **Loss** from all **Claims** for which this Policy provides coverage, regardless of the time of payment by the Insurer, and regardless of whether such **Claims** are made during the **Policy Period** or during any Discovery Period (if purchased).

**Defense Expenses** will be part of and not in addition to the Limit of Liability, and payment of **Defense Expenses** by the Insurer will reduce its Limit of Liability.

If the Limit of Liability is exhausted by the payment of **Loss**, the premium for this Policy will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind or nature whatsoever under this Policy.

6. **Defense and Settlement**

The Insurer will have no duty under this Policy to defend any **Claim**. No **Defense Expenses** may be incurred, no liability may be admitted, and no settlement of any **Claim** may be made or negotiated without the Insurer's written consent, such consent not to be unreasonably withheld.

The Insurer shall not be liable for any **Defense Expenses**, admission or settlement to which the Insurer has not consented.

The Insurer shall advance covered **Defense Expenses** on a current basis, but no later than ninety (90) days after the receipt by the Insurer of properly itemized and detailed **Defense Expense** invoices. The **Insured Persons** agree that such advancement amounts shall be repaid to the Insurer by the **Insured Persons** severally according to their respective interests if and to the extent it is finally established that any such **Insured Person** shall not be entitled under the terms and conditions of this Policy to coverage for such **Defense Expenses**.

The **Insured Persons** agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agree that in the event of a **Claim** the **Insured Persons** will do nothing that shall prejudice the Insurer's position or its potential or actual rights of recovery. The Insurer may make any investigation it deems necessary. The Insurer shall have the right and shall be given the opportunity to effectively associate with the **Insured Persons** in the investigation, defense, and settlement (including the negotiation of a settlement) of any **Claim** that appears reasonably likely to be covered in whole or in part by this Policy.

The failure of any **Insured Person** to comply with his or her obligations under this Section 6. shall not impair the rights of any other **Insured Person** under this Policy.

7. **Notice/Claim Reporting Provisions**

The **Insured Person** or the **Entity** must give to the Insurer written notice of any **Claim**, with full details, as soon as practicable after the in-house general counsel or risk manager of the **Parent Company** first learns of such **Claim**, but in no event later than (i) sixty (60) days after the end of the **Policy Period** or (ii) expiration of the Discovery Period (if purchased). If the **Insured Person** and the **Entity** fail to provide notice of a **Claim** to the Insurer as soon as practicable as provided above, the Insurer shall not be entitled to deny coverage for the **Claim** based solely upon late notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such late notice.

All notices under this Policy shall be in writing and given by prepaid express courier, certified mail, e-mail or fax properly addressed to the appropriate party. Notice to the **Insured Persons** or **Entity** may be given to the **Parent Company** at the address shown in Item 1. of the Declarations of this Policy. Notice to the Insurer of any **Claim** or potential **Claim** shall be given to:

RLI Insurance Company
Attention: Claim Department
9025 North Lindbergh Drive
Peoria, Illinois 61615-1431
Fax: 1-866-692-6796
E-mail: new.claim@rlicorp.com

All other notices to the Insurer under this Policy shall be given to the same addressee but to the attention of the Underwriting Department. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

If, during the **Policy Period** or the Discovery Period (if purchased):

a.  the **Insured Persons** first become aware of a circumstance or a **Wrongful Act** which may reasonably give rise to a **Claim**, and

b.  the **Insured Persons** give the Insurer written notice of such circumstance or **Wrongful Act**, including a description of the circumstance or **Wrongful Act**, the identities of the potential claimants, the consequences which have resulted or may result from such circumstance or **Wrongful Act** and how the **Insured Person** first became aware of such circumstance or **Wrongful Act**, and

c.  the **Insured Persons** request coverage under this Policy for any subsequent **Claim** arising from such circumstance or **Wrongful Act**;

then the Insurer will treat any such subsequent **Claim** as if it had been first made during the **Policy Period.**

8. **Renewal**

Except in the event this Policy is cancelled in accordance with Section 9. of this Policy, on each expiration date of this Policy, upon submission of the renewal application and payment of the required premium for such renewal, this Policy shall be renewed to a date one year beyond its previously stated expiration date, unless written notice is given by the Insurer to the **Parent Company**, or by the **Parent Company** to the Insurer, that such Policy renewal is not desired. Such written notice must be given at least sixty (60) days prior to the expiration date of this Policy.

9. **Cancellation**

This Policy may not be cancelled by either the **Entity**, the **Insured Persons** or the Insurer, except that this Policy may be cancelled by the Insurer ten (10) days after the receipt by the **Parent Company** of a written notice of termination from the Insurer based upon failure to pay premium due, unless such premium is received by the Insurer prior to such tenth (10th) day.

10. **Rescission Waiver**

This Policy shall not be rescinded or voided by the Insurer in whole or in part for any reason.

11. **Bankruptcy**

In the event a liquidation or reorganization proceeding is commenced by or against the **Entity** pursuant to the **Bankruptcy Code**, the **Entity** and the **Insured Persons** hereby:

a.  waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeds under the **Bankruptcy Code**, and

b.  agree not to oppose or object to any efforts by the Insurer, the **Entity** or any **Insured Person** to obtain relief from any such stay or injunction.

In the event the **Entity** becomes a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country and the aggregate **Loss** due under this Policy exceeds the remaining available Limit of Liability, the Insurer shall: (i) first pay such **Loss** allocable to **Wrongful Acts** that are actually or allegedly caused, committed, or attempted prior to the **Entity** becoming a debtor in possession, then (ii) with respect to whatever remaining amount of the Limit of Liability is available after payment under (i) above, pay such **Loss** allocable to **Wrongful Acts** that are actually or alleged caused, committed, or attempted after the **Entity** became a debtor in possession.

12. **Acquisitions, Mergers and Subsidiaries**

If during the **Policy Period** the **Entity**:

a.  acquires securities or voting rights in another organization, or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**, or

b.  acquires any organization by merger into or consolidation with such **Entity** (the "Event"),

then coverage under this Policy shall apply to the **Insured Persons** of such organization if:

(i)  the total consolidated assets of such organization as reflected in its then most recent consolidated financial statements are less than fifty percent (50%) of the total consolidated assets of the **Parent Company** as reflected in the **Parent Company's** then most recent consolidated financial statements, or

(ii) with respect to any such organization not described in (i) above, the **Entity** gives written notice to the Insurer of the Event within ninety (90) days of such Event together with such information as the Insurer may require, and the **Entity** pays any reasonable additional premium required by the Insurer.

Coverage for such **Insured Persons** shall be afforded, subject to the terms and conditions of this Policy, from the date of the Event, but only for **Wrongful Acts** committed or allegedly committed after the Event, unless the Insurer agrees by endorsement to provide coverage for **Wrongful Acts** committed or allegedly committed prior to such date.

13. **Change of Control**

If, during the **Policy Period**:

a. the **Parent Company** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or organization or group of persons or organizations acting in concert such that the **Parent Company** is not the surviving entity; or

b. any person or organization or group of persons or organizations acting in concert shall acquire securities or voting rights which result in such person(s) and organization(s) collectively owning more than fifty percent (50%) of the voting power for the election of directors or equivalent executives of the **Parent Company**;

(either of the above events herein referred to as the "Transaction")

then this Policy shall continue in full force and effect until expiration of the **Policy Period** but only with respect to **Claims** for **Wrongful Acts** occurring prior to the effective time of the Transaction. There shall be no coverage afforded by any provision of this Policy for any **Wrongful Act** occurring after the effective time of the Transaction, and the entire premium for this Policy shall be deemed fully earned as of such time. The **Parent Company** and the **Insured Persons** shall also then have the right to elect a Discovery Period described in Section 14. of this Policy or a greater period as may be negotiated with the Insurer.

The **Parent Company** shall give the Insurer written notice of the Transaction as soon as practicable, but not later than ninety (90) days after the effective date of the Transaction.

14. **Discovery Period**

If:

a. either the Insurer or the **Parent Company** refuses or declines to renew this Policy for any reason; or

b. a Transaction described in Section 13. of this Policy occurs, and

within sixty (60) days after the end of the **Policy Period** the **Parent Company** or the **Insured Persons** elect to purchase a Discovery Period (the "Discovery Period") by paying the additional premium set forth in Item 6. (a) of the Declarations for this Policy, then the coverage otherwise afforded by this Policy will be extended for the period set forth in Item 6. (b) of the Declarations for this Policy.

The additional premium for such Discovery Period shall not exceed the following parameters: (i) 100% of this Policy's annual premium for a one (1) year Discovery Period; (ii) 125% of this Policy's annual premium for a three (3) year Discovery Period; or (iii) 150% of this Policy's annual premium for a six (6) year Discovery Period.

Coverage under this Policy for **Claims** first made during the Discovery Period shall only apply to **Claims** for **Wrongful Acts** occurring before the end of the **Policy Period** or the date of any Transaction under Section 13. of this Policy, whichever is earlier. The Limit of Liability for the Discovery Period (if purchased) shall be part of, and not in addition to, the Limit of Liability for the **Policy Period**.

As a condition precedent to the right to exercise the Discovery Period, the total premium for this Policy must have been paid in full.

If the Discovery Period is purchased, the entire premium for the Discovery Period shall be deemed fully earned at its commencement.

15. **Marital or Domestic Partner Extension**

Subject otherwise to the terms and conditions hereof, this Policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or domestic partner (whether such stature is derived by reason of statutory law, common law, or any other applicable law of any jurisdiction in the world) of an **Insured Person** arising solely out of his or her capacity as the spouse or domestic partner of an **Insured Person**, including such **Claims** that seek damages recoverable from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner; provided, however, this extension shall not afford coverage for **Wrongful Acts** of the spouse or domestic partner. All terms, conditions and other provisions of this Policy which would be applicable to **Loss** incurred by the **Insured Person** in such **Claim** shall also apply to **Loss** incurred by the spouse or domestic partner in such **Claim**.

16. **Outside Position Coverage**

All coverage under this Policy for **Loss** as a result of **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Positions** will be specifically excess of, and will not contribute with, the amount of payment from any other valid and collectible management liability insurance available to such **Insured Persons** by reason of their service in such **Outside Positions**.

17. **Representations; Severability**

The **Insured Persons** represent that the particulars and statements contained in or attached to the Application for this Policy are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of those representations, and agree that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy.

No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person** for purposes of this Policy.

This Policy is signed for the Insurer by its authorized officers. It is countersigned on the Declarations, where required by law, by a duly authorized agent of the Insurer.

18. **Subrogation; Indemnification**

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the **Insured Persons'** rights of recovery, including without limitation rights of recovery from the **Entity** for indemnification or advancement. The **Insured Persons** shall execute and deliver all instruments and papers and do whatever else is necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insured Person**. The Insurer shall not exercise its rights of subrogation against an **Insured Person** unless and to the extent Exclusion 4. a. applies to such **Insured Person**.

19. **Other Insurance**

Except as otherwise expressly provided in this Policy, if any **Loss** is insured under any other valid and collectible management liability policy(ies), prior or current, then this Policy shall cover such **Loss** subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of payment from such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, provided this Section 19. shall not apply with respect to any **Underlying Insurance** or any  insurance that is written only as specific excess insurance over the Limit of Liability provided in this Policy. However, if **Loss** covered under this Policy is not paid by such other insurance, this Policy will advance such **Loss** on behalf of the **Insured Persons**, subject to all of this Policy's terms, conditions and limitations and without prejudice to the Insurer's excess position.

20. **Worldwide Territory**

Coverage under this Policy shall extend to **Wrongful Acts** taking place, **Loss** incurred or **Claims** made anywhere in the world.

21. **Valuation and Foreign Currency**

All premiums, limits, retentions/deductibles, loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of loss is due, respectively.

22. **Authorization**

The **Parent Company** shall act on behalf of all **Insured Persons** with respect to the giving and receiving of notice of nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this Policy and the negotiation, agreement to and acceptance of any endorsements issued to form a part of this Policy. In addition to any right of the **Insured Persons**, the **Parent Company** may also act on behalf of all **Insured Persons** with respect to the notice of **Claims** and the exercising or declining to exercise any right to a Discovery Period.

23. **Action Against the Insurer**

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms and conditions of this Policy, nor until the amount of the **Insured Person's** obligation to pay shall have been finally determined either by judgment against the **Insured Person** after actual trial or by written agreement of the **Insured Person**, the claimant and the Insurer.

No person or organization shall have any right under this Policy to join the Insurer as a party to any action against the **Insured Persons** to determine the **Insured Person's** liability, nor shall the Insurer be impleaded by the **Insured Persons** or their legal representatives. Bankruptcy or insolvency of the **Insured Persons** or of the estate of any **Insured Person** shall not relieve the Insurer of any of its obligations hereunder.

Only if requested by the **Insured Persons**, the Insurer shall submit any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree, the arbitration shall be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel shall consist of one arbitrator selected by the **Insured Persons**, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

24. **Assignment**

This Policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

25. **Changes**

The terms and conditions of this Policy shall not be waived or changed, except by endorsement issued to form a part of this Policy.

26. **State Amendatory Inconsistency**

In the event that there is an inconsistency between a state amendatory endorsement attached to this Policy and any other term or condition of this Policy, then the Insurer shall to the extent permitted by law apply whichever of such inconsistent provisions is most favorable to the **Insured Persons**.

27. **Headings**

The descriptions in the headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

28. **Entire Agreement**

The **Insured Persons** agree this Policy, including the Application and any endorsements, constitutes the entire agreement between the **Insured Persons** and the Insurer or any of its agents relating to this insurance.

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

_____
Corporate Secretary

_____
President & COO

Coverage:  **Executive Plus Directors and Officers Liability**          Insurer: **RLI Insurance Company**

Effective date of                                                To be attached to and form part of
this endorsement: **12/25/2018**                                 Policy No.  **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

It is hereby understood and agreed that **INSURING CLAUSES**, Section 1. of this Policy is deleted in its entirety and replaced with the following:

With respect to any one or more certified acts of terrorism, we will not pay any amount for which we are not responsible under the terms of the Terrorism Risk Insurance Act, as amended ("Terrorism Risk Insurance Act"), due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in  consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the Terrorism Risk Insurance Act. The Terrorism Risk Insurance Act includes the following criteria for a certified act of terrorism:

1.  The act resulted in aggregate losses in excess of $5 million; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to certified acts of terrorism under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to the pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

If the Terrorism Risk Insurance Act is terminated, not renewed, allowed to expire, or otherwise discontinued during the Policy Period and we have charged premium for coverage under the Terrorism Risk Insurance Act, we will reimburse the premium, if any, charged for coverage under the Terrorism Risk Insurance Act.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of this endorsement: **12/25/2018**

To be attached to and form part of Policy No. **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### FLORIDA AMENDATORY ENDORSEMENT

1) Section 1., **INSURING CLAUSES**, is deleted in its entirety and replaced with the following:

    1. The Insurer will pay on behalf of the **Insured Persons**, **Loss** which the **Insured Persons** are legally obligated to pay as a result of **Claims** first made during the **Policy Period**, or during the Discovery Period (if purchased), against the **Insured Persons** for **Wrongful Acts**; provided that if this Policy affords Excess Coverage as provided in Item 4. of the Declarations of this Policy, the Insurer shall not be liable for any **Loss** unless such **Loss** is not paid by the **Underlying Insurance** by reason of one or more of the following:

        a. the insurer(s) of the **Underlying Insurance**:

            (i) refuses to pay or indemnify the **Insured Persons** as required under the terms and conditions of the **Underlying Insurance**; or

            (ii) is financially unable to pay or indemnify the **Insured Persons**; or

            (iii) rescinds or attempts to rescind the **Underlying Insurance**; or

            (iv) fails to pay or indemnify the **Insured Persons** within sixty (60) days after a written request by or on behalf of the **Insured Persons** for such payment or indemnification; or

        b. according to the terms and conditions of the **Underlying Insurance**, the insurer(s) of the **Underlying Insurance** is not liable for such **Loss**; or

        c. the limit(s) of liability or any applicable sublimit(s) of liability of the **Underlying Insurance** has been exhausted by reason of losses paid thereunder by the insurer(s) of the **Underlying Insurance**; or

        d. a liquidation or reorganization proceeding is commenced by or against the **Entity** pursuant to the **Bankruptcy Code** and as a result of such proceeding the insurer(s) of the **Underlying Insurance** refuse to pay or indemnify such **Loss** because the proceeds of the **Underlying Insurance** are subject to the automatic stay or similar payment prohibition under the **Bankruptcy Code**; provided that as a condition precedent to the Insurer being liable pursuant to this paragraph d., the **Insured Persons** or the **Entity** shall request, or arrange for the insurer of the **Underlying Insurance** to request, relief from the automatic stay or such similar payment prohibition with respect to such proceeds.

2) Section 3., **DEFINITIONS,** is amended by deleting the definition of **"Loss"** in its entirety and replacing it with the following:

**"Loss** means monetary damages, judgments, settlements, including but not limited to pre-judgment and post-judgment interest, and **Defense Expenses** which the **Insured Persons** are legally obligated to pay as a result of a covered **Claim**.

**Loss** shall not include punitive or exemplary damages, or the multiple portion of multiplied damages, taxes, civil or criminal fines or penalties imposed by law, any amount for which the **Insured Persons** are absolved from payment, or matters which are uninsurable under the law pursuant to which this Policy shall be construed. Solely with respect to a **Claim** arising out of a public offering of securities of the **Entity**, the Insurer shall not assert that part or all of the **Defense Expenses** or any settlement in such **Claim** is uninsurable due to the actual or alleged violation of Section 11 or 12 of the Securities Act of 1933, as amended."

3) Section 8., **Renewal**, is deleted in its entirety and replaced with the following:

"8.  **Renewal**

Except in the event this Policy is cancelled in accordance with Section 9. of this Policy, on each expiration date of this Policy, upon submission of the renewal application and payment of the required premium for such renewal, this Policy shall be renewed to a date one year beyond its previously stated expiration date, unless written notice is given by the **Parent Company** to the Insurer, that such Policy renewal is not desired, or unless written notice is given by the Insurer to the **Parent Company**, (at the address shown in the Declarations). Such written notice, from the Insurer, must be given not less than sixty (60) days prior to the expiration of the Policy and be accompanied by the reason for nonrenewal. If mailed, such notice of nonrenewal shall be by registered, certified or other first class mail. The mailing of such notice of nonrenewal shall be sufficient proof of notice of nonrenewal."

4) Section 9., **Cancellation**, is deleted in its entirety and replaced with the following:

"9.  **Cancellation**

The **Parent Company** or the **Insured Persons** may cancel this Policy at any time by written notice or by surrender of this Policy. If the **Parent Company** or **Insured Persons** cancel this Policy the Insurer will refund any premium due based on customary short rates.

This Policy may be cancelled by or on behalf of the Insurer, but only for nonpayment of premium. If the Insurer cancels this Policy, it shall deliver or mail to the **Parent Company**, at the **Parent Company's** address shown on the Declarations, written notice of cancellation. Such notice shall state when, not less than ten (10) days thereafter, the cancellation shall be effective. If mailed, such notice shall be by registered, certified or other first class mail. The mailing of such notice shall be sufficient proof of notice. This Policy shall terminate at the date and hour specified in such notice. If any premium refund is due, premium shall be refunded based on a customary pro rata basis."

5) Section 14., **Discovery Period**, is deleted in its entirety and replaced with the following:

"14. **Discovery Period**

If:

a.   the **Parent Company** or **Insured Persons** cancels this Policy;

b.   either the Insurer or the **Parent Company** refuses or declines to renew this Policy for any reason; or

c.   a Transaction described in Section 13. occurs, and

within sixty (60) days after the end of the **Policy Period** the **Parent Company** or the **Insured Persons** elect to purchase a Discovery Period (the "Discovery Period") by paying the additional premium set forth in Item 6. (a) of the Declarations for this Policy, then the coverage otherwise afforded by this Policy will be extended for the period set forth in Item 6. (b) of the Declarations for this Policy.

The additional premium for such Discovery Period shall not exceed the following parameters: (i) 150% of this Policy's annual premium for a one (1) year Discovery Period; (ii) 200% of this Policy's annual premium for a three (3) year Discovery Period; or (iii) 250% of this Policy's annual premium for a six (6) year Discovery Period.

Coverage under this Policy for **Claims** first made during the Discovery Period shall only apply to **Claims** for **Wrongful Acts** occurring before the end of the **Policy Period** or the date of any Transaction under Section 13. of this Policy, whichever is earlier. The Limit of Liability for the Discovery Period (if purchased) shall be part of, and not in addition to, the Limit of Liability for the **Policy Period**.

As a condition precedent to the right to exercise the Discovery Period, the total premium for this Policy must have been paid in full.

If the Discovery Period is purchased, the entire premium for the Discovery Period shall be deemed fully earned at its commencement."

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of this endorsement: **12/25/2018**

To be attached to and form part of Policy No. **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL LIMIT OF LIABILITY ENDORSEMENT (INDEPENDENT DIRECTORS)

It is agreed that:

1. If the Limit of Liability in Item 3. of the Declarations is exhausted by reason of payment by the Insurer of covered **Loss**, then this Policy will afford coverage for any additional covered **Loss** incurred by the **Independent Directors**, provided such additional coverage: (i) shall be excess of all other insurance specifically excess of this Policy, subject to the difference-in-conditions provisions in subparagraphs a. through d. of Section 1. of this Policy, (ii) shall be subject to the **Independent Director** Limit of Liability set forth below, which shall be the maximum aggregate additional liability of the Insurer under this Endorsement for all covered **Loss** incurred by **Independent Directors** as a result of all **Claims** first made during the **Policy Period** or during the Discovery Period (if purchased), and (iii) shall be subject to all other terms and conditions of this Policy.

2. If the amount of covered **Loss** which is otherwise due and owing by the Insurer under this Policy is subject to both the then-remaining Limit of Liability in Item 3. of the Declarations and the **Independent Director** Limit of Liability set forth below, and if such **Loss** is incurred by both **Independent Directors** and officers, then such **Loss** shall be allocated to and paid by the Insurer under the respective Limits of Liability in whatever portions will maximize the total amount of such **Loss** being paid under this Policy.

**Independent Director** Limit of Liability:    $ 1,000,000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **12/25/2018**

To be attached to and form part of
Policy No. **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DEPLETION OF UNDERLYING INSURANCE ENDORSEMENT

It is agreed that Section 1. c. of this Policy is amended to read in its entirety as follows:

"c.  the limit(s) of liability or any applicable sublimit(s) of liability of the **Underlying Insurance** has been exhausted by reason of the insurer(s) of the **Underlying Insurance**, the **Insured Persons**, the **Entity** or any other source paying losses covered under the **Underlying Insurance**; or"

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of this endorsement: **12/25/2018**

To be attached to and form part of Policy No. **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF CLAIM

It is agreed that the definition of "**Claim**" in Sections 3. d. and 3. e. of this Policy is amended to read as follows:

d.  a mediation, administrative, regulatory or arbitration proceeding against any **Insured Person** commenced by the filing of a notice of charges or formal investigative order; or

e.  a formal or informal civil, criminal, administrative or regulatory investigation against any **Insured Person** commenced by the service upon or other receipt by the **Insured Person** of a subpoena or written notice, including without limitation an SEC Wells Notice, from the investigating authority identifying such **Insured Person** as an individual against whom a proceeding may be commenced; or

It is further agreed that the definition of "**Claim**" in Section 3. of this Policy is amended to add the following:

j.  any request or demand by a regulatory, administrative, governmental or similar authority to interview or depose an **Insured Person**, or for an **Insured Person** to provide information in connection with any investigation of any **Insured Person** or **Entity**,

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **12/25/2018**

To be attached to and form part of
Policy No. **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND CONDUCT EXCLUSION (II)

It is agreed that Sections 4. a. (i) and 4. a. (ii) of this Policy are deleted in their entirety and replaced with the following:

"(i) gaining any profit, remuneration or financial advantage to which such **Insured Person** is not legally entitled if a final and non-appealable adjudication in the underlying action adverse to such **Insured Person** in such **Claim** establishes that such **Insured Person** gained such profit, remuneration or financial advantage, or such **Insured Person** agrees to repay or disgorge such profit, remuneration or financial advantage; or

(ii) committing any deliberately fraudulent or deliberately criminal **Wrongful Act** or any willful violation of criminal law if a final and non-appealable adjudication in the underlying action adverse to such **Insured Person** in such **Claim** establishes that such **Insured Person** committed such a **Wrongful Act** or willful violation.

However, this Exclusion shall not apply to:

(a) **Defense Expenses**;

(b) **Independent Directors**; or

(c) any employment-related **Claim**."

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **12/25/2018**

To be attached to and form part of
Policy No. **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND ACQUISITIONS, MERGERS AND SUBSIDIARIES

It is agreed that Section 12. is deleted in its entirety and replaced with the following:

12. **Acquisitions, Mergers and Subsidiaries**

If during the **Policy Period** the **Entity**:

a.  acquires securities or voting rights in another organization, or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**, or

b.  acquires any organization by merger into or consolidation with such **Entity** (the "**Event**"),

then coverage under this Policy shall apply to the **Insured Persons** of such organization if:

(i)  the total consolidated assets of such organization as reflected in its then most recent consolidated financial statements are less than <u>thirty-five</u> percent ( 35 %) of the total consolidated assets of the **Parent Company** as reflected in the **Parent Company's** then most recent consolidated financial statements, or

(ii)  with respect to any such organization not described in (i) above, the **Entity** gives written notice to the Insurer of the Event within ninety (90) days of such Event together with such information as the Insurer may require, and the **Entity** pays any reasonable additional premium required by the Insurer.

Coverage for such **Insured Persons** shall be afforded, subject to the terms and conditions of this Policy, from the date of the Event, but only for **Wrongful Acts** committed or allegedly committed after the Event, unless the Insurer agrees by endorsement to provide coverage for **Wrongful Acts** committed or allegedly committed prior to such date.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **12/25/2018**

To be attached to and form part of
Policy No. **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## STATE AMENDATORY INCONSISTENCY ENDORSEMENT

In consideration of the premium charged, it is agreed that in the event that there is an inconsistency between a state amendatory endorsement attached to this Policy and any other term or condition of this Policy, then the Insurer shall to the extent permitted by law apply whichever of such inconsistent provisions is more favorable to the **Insured Person**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Policy Number:  EPG0027008



**RLI Insurance Company**
Peoria, Illinois 61615

## ATTENTION POLICYHOLDER:

### <u>KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS</u>

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false, incomplete, or misleading information, or conceals information concerning any material fact thereto, commits a fraudulent insurance act, which is a crime punishable by incarceration, and shall also be subject to civil penalties.

Insured

Policy Number: EPG0027008

RLI Insurance Company
9025 N. Lindbergh Drive
Peoria, Illinois 61615

# STATE OF FLORIDA
# DISCLOSURE NOTICE

## KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS

If you should have a question or dispute concerning your coverage, your premium or a claim, you should contact your agent or **RLI Insurance Company**. You may call RLI Insurance Company to obtain information or to make a complaint at the following number:

## 1-309-692-1000

This Notice is for information only and does not become a part of or a condition of your policy.

UW-1009 (08/95)

Insured

Policy Number:  EPG0027008



**RLI Insurance Company**
Peoria, Illinois 61615

# NOTICE TO POLICYHOLDERS

## REGARDING THE UNITED STATES TREASURY DEPARTMENT – OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

This Policyholder Notice does not provide coverage nor can it be construed to replace any provisions of your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered by your policy. This Notice should only be used to provide information concerning the possible impact of your insurance coverage as it relates to directives issued by OFAC.

**PLEASE READ THIS NOTICE CAREFULLY.**

OFAC administers and enforces economic and trade sanctions and places restrictions on certain transactions. OFAC acts pursuant to Executive Orders of the President of the United States and specific legislation. OFAC has identified and named numerous foreign agents, front organizations, terrorists, terrorist organizations, and narcotics traffickers, among others, as "Specially Designated Nationals and Blocked Persons." The complete list can be found on the United States Treasury website – http://www.treas.gov/ofac.

Various trade or economic sanctions and other laws or regulations prohibit us from providing insurance in certain circumstances. In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance contract is considered a blocked or frozen contract and will be considered null and void. When an insurance policy is considered to be a blocked or frozen contract, all provisions of this insurance will be immediately subject to OFAC, and neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply.

Insured

Policy Number:  EPG0027008



**RLI Insurance Company**
9025 N. Lindbergh Drive
Peoria, Illinois 61615

# FLORIDA QUALIFICATION AS LARGE COMMERCIAL RISK

Rule 69O-170.019 of the Florida Administrative Code provides that risks that qualify as "large commercial risks" may be individually rated not in accordance with the insurer's rates, rating schedules, rating manuals, underwriting rules, and rating plans filed with the Office of Insurance Regulation of the State of Florida.  The policy designated below has been individually rated as so provided because the insured qualifies as a "large commercial risk" by meeting at least two of the following criteria:

**(Check the box for all applicable criteria)**

☐  Employs at least 500 full time employees or their equivalent;

☐  Generates net revenue of at least $100,000,000 in the latest fiscal year as reported in audited financial statements;

☐  Has a net of worth of at least $50,000,000 the latest fiscal year as reported in audited financial statements;

☐  Pays annual property/casualty insurance premiums of at least $500,000 in total for the following types of insurance: (a) commercial property including allied lines, (b) commercial auto, (c) commercial general liability;

☐  Procures insurance through a certified risk manager who has at least one of the following credentials:  ARM, CPCU, CRM, FRM, BA or higher degree in risk management, or has at least seven years of experience in risk financing, claims administration, loss prevention, or risk and insurance coverage analysis;

☐  A public entity with a population in excess of 50,000;

☐  A nonprofit organization or a public entity with a minimum annual budget of $45,000,000.

The above qualifications may be certified by an authorized representative of the large commercial policyholder below, or file documentation that supports the designated qualifications may be maintained in file in lieu of policyholder certification.

_____          _____
Policy Number(s)                                    Authorized Representative (Print or Type)


_____          _____
Name of Insured                                     Signature of Authorized Representative


                                                    _____
                                                    Date

Insured

Policy Number: EPG0027008                                          RLI Insurance Company

## SIGNATURE PAGE

In Witness Whereof, RLI Insurance Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Jean M. Stephenson

Corporate Secretary

Craig W. Klut

President & COO

ILF 0001C FL (04/16)

Insured

## Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of this Endorsement: **12/25/2018**

To be attached to and form part of Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### FULL REINSTATEMENT OF LIMITS FOR ALL INSUREDS AND INDEPENDENT DIRECTORS

In the event the Limit of Liability of this Policy is exhausted, this Policy's Limit of Liability shall include a single reinstatement in the amount set forth in Item 3. of the Declarations. Such reinstatement shall not apply to any **Claim** for which there has been any payment of **Loss** under the Limit of Liability of this Policy or any **Claim** based upon, arising out of or related in any way to such **Claim**, and such reinstated limit shall be excess of any amounts payable under all other insurance policies that are specifically excess of this Policy and all underlying insurance providing a similar reinstated limit of liability.

Additionally, in the event the reinstated Limit of Liability of this Policy is exhausted, a second reinstated Limit of Liability in the amount set forth in Item 3. of the Declarations shall be available solely for **Independent Directors**. Such reinstated limit shall become available only after exhaustion of the reinstated Limit of Liability in the above paragraph and shall be excess of any amounts payable under all other insurance policies that are specifically excess of this Policy and all underlying insurance providing a similar reinstated limit of liability.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **12/25/2018**

To be attached to and form part of
Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND DEFENSE AND SETTLEMENT (V)

It is hereby understood and agreed that Section 6. of this Policy is deleted in its entirety and replaced with the following:

"6. **Defense and Settlement**

The Insurer will have no duty under this Policy to defend any **Claim**. No **Defense Expenses** may be incurred, no liability may be admitted, and no settlement of any **Claim** may be made or negotiated without the Insurer's written consent, such consent not to be unreasonably withheld.

The Insurer shall not be liable for any **Defense Expenses**, admission or settlement to which the Insurer has not consented, such consent not to be unreasonably withheld.

The Insurer shall advance covered **Defense Expenses** on a current basis, but no later than sixty (60) days after the receipt by the Insurer of properly itemized and detailed **Defense Expense** invoices. The **Insured Persons** agree that such advancement amounts shall be repaid to the Insurer by the **Insured Persons** severally according to their respective interests if and to the extent it is finally established that any such **Insured Person** shall not be entitled under the terms and conditions of this Policy to coverage for such **Defense Expenses**.

The **Insured Persons** agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agree that in the event of a **Claim** the **Insured Persons** will do nothing that shall prejudice the Insurer's position or its potential or actual rights of recovery. The Insurer may make any investigation it deems necessary. The Insurer shall have the right and shall be given the opportunity to effectively associate with the **Insured Persons** in the investigation, defense, and settlement (including the negotiation of a settlement) of any **Claim** that appears reasonably likely to be covered in whole or in part by this Policy.

The failure of any **Insured Person** to comply with his or her obligations under this Section 6. shall not impair the rights of any other **Insured Person** under this Policy.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **12/25/2018**

To be attached to and form part of
Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ADDITIONAL ENTITY ENDORSEMENT

It is hereby understood and agreed that the definition of "**Entity**" in Section 3. of this Policy is amended to also include the following additional entities:

Gemini Re
Gemini Ltd.

And any other trust, foundation, not-for-profit or for-profit Company managed or controlled by the Company but only while it is acting for the sole benefit of such Company.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **12/25/2018**

To be attached to and form part of
Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**DELETE EXCLUSION 4. c. (iii) - PRIOR NOTICE**

It is hereby understood and agreed that Section 4. c. (iii) is deleted in its entirety.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

| | |
|---|---|
| Coverage Section: **Executive Plus Directors and Officers Liability** | Insurer: **RLI Insurance Company** |
| Effective date of this Endorsement: **12/25/2018** | To be attached to and form part of Policy No.: **EPG0027008** |
| Issued to: **Gemini Financial Holdings, LLC** | |

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND DEFINITION OF LOSS (IV)

It is hereby understood and agreed that subpart (i) of the definition of "**Loss**" in Section 3. of this Policy is deleted in its entirety and replaced with the following:

(i)   taxes, fines or penalties other than taxes, fines or penalties impose upon an **Entity** for which the **Insured Persons** are legally liable solely by reason of the **Entity's** insolvency;

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **12/25/2018**

To be attached to and form part of
Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND EXCLUSIONS

It is hereby understood and agreed that Section 4., **EXCLUSIONS**, of this Policy is deleted in its entirety and replaced with the following:

4. The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured Person**:

   a.  based upon, arising out of or attributable to such **Insured Person**:

     (i)  gaining any personal profit, remuneration or financial advantage to which such **Insured Person** is not legally entitled if a final and non-appealable adjudication in the underlying action adverse to such **Insured Person** in such **Claim** establishes that such **Insured Person** gained such personal profit, remuneration or financial advantage; or

     (ii)  committing any deliberately fraudulent or deliberately criminal **Wrongful Act** or any willful violation of criminal law if a final and non-appealable adjudication in the underlying action adverse to such **Insured Person** in such **Claim** establishes that such **Insured Person** committed such a **Wrongful Act** or willful violation.

      However, this Exclusion shall not apply to:

     (a) **Defense Expenses**;

     (b) any employment-related **Claim**."

To determine the applicability of the foregoing Exclusions, no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person**.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **12/25/2018**

To be attached to and form part of
Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND SECTION 19. OTHER INSURANCE

1. It is hereby understood and agreed that Section 3., **DEFINITIONS**, of this Policy is amended by adding the following:

   "**Non-Indemnified Loss**" means Loss (i) which the **Entity** is not permitted to indemnify or advance, (ii) which the **Entity** refuses to indemnify or advance, or fails to indemnify or advance within forty-five (45) days after the **Insured Person's** request for such indemnification or advancement, or (iii) for which the **Entity** is financially unable to indemnify or advance. With respect to coverage for an **Insured Person** serving in an **Outside Position**, the reference to "**Entity**" in this definition shall also include the **Outside Entity**. Without limitation, **Non-Indemnified Loss** includes **Defense Expenses** previously advanced by the **Entity** or **Outside Entity** which the **Insured Persons** become legally obligated to repay to such **Entity** or **Outside Entity**.

2. It is further understood and agreed that Section 19., **OTHER INSURANCE**, of this Policy is deleted in its entirety and replaced with the following:

### 19. Other Insurance and Indemnification

The **Insured Persons** and the **Entity** understand and agree that all coverage under this Policy shall be specifically excess over, and shall not contribute with:

   a. all indemnification (other than insurance) to which the **Insured Persons** may be entitled from any source, including but not limited to the **Entity** or any **Outside Entity**; and

   b. the **Underlying Insurance** and any other valid and collectible insurance maintained by the **Entity**, an **Outside Entity** or any other entity, whether such other insurance is stated to be primary, contributory, excess, or otherwise, unless such other insurance is (i) expressly excess of this Policy by specific reference in such other policy to this Policy, or (ii) a personal liability or umbrella insurance policy purchased by an **Insured Person**.

However, if **Non-Indemnified Loss** which is otherwise covered under this Policy is not paid by the **Underlying Insurance** or by such other insurance or indemnification, this Policy will pay such **Non-Indemnified Loss** notwithstanding the existence of the **Underlying Insurance** or such other insurance or indemnification right, subject to all of the terms, conditions and limitations of this Policy and without prejudice to the Insurer's excess position or subrogation rights against the **Underlying Insurance** or such other insurance or indemnification.

If the Insurer pays under this Policy any **Defense Expenses** or other **Non-Indemnified Loss** for which the **Entity** is legally permitted or required and financially able to advance or indemnify, then the **Entity** shall reimburse the Insurer for such amounts, and such amounts shall become immediately due and payable as a direct obligation of the **Entity** to the Insurer.

Except as provided in Section 2. above, this Policy shall not be subject to the terms or conditions of any other insurance. The Insurer does not waive, compromise or release any of its rights to recover **Non-Indemnified Loss** paid under this Policy from the insurer(s) of the **Underlying Insurance** or any other insurance under which coverage may be owed, or from any person or entity from which **Insured Persons** are entitled to indemnification.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

| | |
|---|---|
| Coverage Section: **Executive Plus Directors and Officers Liability** | Insurer: **RLI Insurance Company** |

Effective date of
this Endorsement: **12/25/2018**

To be attached to and form part of
Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**PRELIMINARY INQUIRY COSTS ENDORSEMENT**

## I. AMEND INSURING CLAUSES

This Policy is amended by adding the following to the end of Section 1. of **INSURING CLAUSES**:

In addition, the Insurer will pay on behalf of any **Insured Person** the following amounts incurred by the **Insured Persons** to the extent such amounts are not otherwise covered under this Policy and are not indemnified by the **Entity** as described in the definition of **Non-Indemnified Loss** below:

**Preliminary Inquiry Costs** in connection with a **Preliminary Inquiry** first received by an **Insured Person** during the **Policy Period** or during the Discovery Period (if purchased), but only if the **Entity** or the **Insured Person** elect in their sole discretion to give notice to the Insurer of such **Preliminary Inquiry**; provided coverage for **Preliminary Inquiry Costs** shall apply only to **Preliminary Inquiry Costs** incurred by **Insured Persons** after the date of such notice to the Insurer.

## II. AMEND DEFINITIONS

Section 3. of this Policy is amended as follows

### A.  Amend Definition of Claim

The definition of **Claim** is amended to include the following:

j.   solely with respect to coverage afforded under this endorsement, a **Preliminary Inquiry**.

### B.  Add Definition of Enforcement Body

**"Enforcement Body"** means any federal, state, local or foreign enforcement authority or government investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and the attorney general of any state); or the enforcement arm of any securities or commodities exchange or other self-regulatory agency.

### C.  Amend Definition of Loss

The definition of **Loss** is deleted and replaced with the following:

"**Loss**" means monetary damages, judgments, settlements, including but not limited to pre-judgment and post-judgment interest, punitive, exemplary or multiple damages where insurable under applicable law, and **Defense Expenses** which the **Insured Persons** are legally obligated to pay as a result of a covered **Claim**.

The law of the jurisdiction most favorable to the insurability of punitive, exemplary or multiple damages or taxes, fines or penalties shall control with respect to the insurability of such matters under this Policy, provided that such jurisdiction is where:

a.  those damages, taxes, fines or penalties were awarded or imposed;

b.  any **Wrongful Act** occurred for which such damages, taxes, fines or penalties were awarded or imposed;

c.  the **Entity** is incorporated or has its principal place of business; or

d.  the Insurer is incorporated or has its principal place of business.

**Loss** shall not include:

(i)  taxes, other than taxes imposed upon an **Entity** for which the **Insured Persons** are legally liable solely by reason of the **Entity's** insolvency;

(ii)  fines or penalties imposed by law, other than civil penalties assessed against an **Insured Person** under Section 308 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. Section 7246 or under Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2(g)(2)(B), **Preliminary Inquiry Costs** or for a non-intentional violation of any other federal, state, local or foreign law;

(iii)  any amount for which the **Insured Persons** are absolved from payment; or

(iv)  matters which are uninsurable under the law pursuant to which this Policy shall be construed.

Solely with respect to a **Claim** arising out of a public offering of securities of the **Entity**, the Insurer shall not assert that part or all of the **Defense Expenses** are uninsurable, or any other **Loss** as a result of such **Claim** is uninsurable, due to the actual or alleged violation of Section 11 or 12 or 15 of the Securities Act of 1933, as amended.

The foregoing exclusions (i) through (iv) shall not apply to **Defense Expenses**.

**D.   Add Definition of Non-Indemnified Loss**

"**Non-Indemnified Loss**" means **Loss** (i) which the **Entity** is not permitted to indemnify or advance, (ii) which the **Entity** refuses to indemnify or advance, or fails to indemnify or advance within forty-five (45) days after the **Insured Person's** request for such indemnification or advancement, or (iii) for which the **Entity** is financially unable to indemnify or advance. With respect to coverage for an **Insured Person** serving in an **Outside Position**, the reference to "**Entity**" in this definition shall also include the **Outside Entity**. Without limitation, **Non-Indemnified Loss** includes **Defense Expenses** previously advanced by the **Entity** or **Outside Entity** which the **Insured Persons** become legally obligated to repay to such **Entity** or **Outside Entity**.

**E.   Add Definition of Preliminary Inquiry**

"**Preliminary Inquiry**" means a pre-**Claim** written request for an **Insured Person** to appear at a meeting, interview or deposition, or to produce documents, concerning the business of the **Entity** or the **Insured Person's** capacity with the **Entity**, if the request is by:

a.  an **Enforcement Body**; or

b.  the **Entity**, including the board of directors or any committee thereof, arising out of (i) an inquiry or investigation by an **Enforcement Body**, or (ii) an investigation of a security holder derivative demand to bring a lawsuit against an **Insured Person** for a **Wrongful Act**.

**Preliminary Inquiry** shall not include a **Claim** or any routine or regularly scheduled regulatory or internal inspection, compliance, review, examination, production or audit conducted in an **Enforcement Body's** or the **Entity's** routine or ordinary review, oversight or compliance process.

A. **Add Definition of Preliminary Inquiry Costs**

"**Preliminary Inquiry Costs**" means the reasonable fees and expenses consented to by the Insurer and incurred by an **Insured Person** solely in connection with the **Insured Person's** preparation for and response to a **Preliminary Inquiry**. **Preliminary Inquiry Costs** shall not include (i) the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, officers or employees, or (ii) the costs of complying with any formal or informal discovery or other request seeking documents, records or electronic information in the possession or control of the **Entity** or any other third-party.

## III. AMEND CONDITIONS

It is agreed that Section 7., **Notice/Claim Reporting Provisions**, of this Policy is deleted in its entirety and replaced with the following:

7. **Notice/Claim Reporting Provisions**

The **Insured Person** or the **Entity** must give to the Insurer written notice of any **Claim**, with full details, as soon as practicable after the in-house general counsel or risk manager of the **Parent Company** first learns of such **Claim**, but in no event later than (i) sixty (60) days after the end of the **Policy Period** or (ii) expiration of the Discovery Period (if purchased). If the **Insured Person** and the **Entity** fail to provide notice of a **Claim** to the Insurer as soon as practicable as provided above, the Insurer shall not be entitled to deny coverage for the **Claim** based solely upon late notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such late notice.

Any **Claim** described in subpart g. or h. of the definition of **Claim** in Section 3. above and any **Preliminary Inquiry** shall be noticed to the Insurer only if and when the **Entity** or the **Insured Persons** elect, in their sole discretion, to give such notice to the Insurer. Coverage under this Policy for any such **Claim** or **Preliminary Inquiry** shall only apply to otherwise covered **Non-Indemnified Loss** incurred after the date notice of such **Claim** or **Preliminary Inquiry** is given to the Insurer

All notices under this Policy shall be in writing and given by prepaid express courier, certified mail, e-mail or fax properly addressed to the appropriate party. Notice to the **Insured Persons** or **Entity** may be given to the **Parent Company** at the address shown in Item 1. of the Declarations of this Policy. Notice to the Insurer of any **Claim** or potential **Claim** shall be given to:

RLI Insurance Company
Attention: Claim Department
9025 North Lindbergh Drive
Peoria, Illinois 61615-1431
Fax: 1-866-692-6796
E-mail: new.claim@rlicorp.com

All other notices to the Insurer under this Policy shall be given to the same addressee but to the attention of the Underwriting Department. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

If, during the **Policy Period** or the Discovery Period (if purchased):

a. the **Insured Persons** first become aware of a circumstance or a **Wrongful Act** which may reasonably give rise to a **Claim**, and

b.   the **Insured Persons** give the Insurer written notice of such circumstance or **Wrongful Act**, including a description of the circumstance or **Wrongful Act**, the identities of the potential claimants, the consequences which have resulted or may result from such circumstance or **Wrongful Act** and how the **Insured Person** first became aware of such circumstance or **Wrongful Act**, and

c.   the **Insured Persons** request coverage under this Policy for any subsequent **Claim** arising from such circumstance or **Wrongful Act**;

then the Insurer will treat any such subsequent **Claim** as if it had been first made during the **Policy Period.**

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

# Executive Plus Directors and Officers Liability Policy

Coverage Section: **Executive Plus Directors and Officers Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **12/25/2018**

To be attached to and form part of
Policy No.: **EPG0027008**

Issued to: **Gemini Financial Holdings, LLC**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND NOTICE/CLAIM REPORTING PROVISIONS (VII)

It is agreed that the first paragraph of Section 7., **Notice/Claim Reporting Provisions**, is deleted in its entirety and replaced with the following:

The **Insured Person** or the **Entity** must give to the Insurer written notice of any **Claim**, with full details, as soon as practicable after the Chief Executive Officer, Chief Financial Officer and Chief Actuary of the **Parent Company** first learns of such **Claim**, but in no event later than (i) one hundred eighty (180) days after the end of the **Policy Period** if this Policy expires and is renewed; (ii) ninety (90) days after the effective date of such expiration or termination if this Policy expires (or is otherwise terminated) without being renewed with the Insurer and no Discovery Period is purchased; or (iii) ninety (90) days after the expiration of the Discovery Period (if purchased). If the **Insured Person** and the **Entity** fail to provide notice of a **Claim** to the Insurer as soon as practicable as provided above, the Insurer shall not be entitled to deny coverage for the **Claim** based solely upon late notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such late notice.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____/

## STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED CASE MANAGEMENT PLAN IN CIVIL CASES IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021 (DCMSO)

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases, the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

---

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties.  No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR).**  ADR provides parties with an out-of-court alternative to settling disagreements.  Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

_____
**Administrative Circuit Judge**